UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

UNITED STATES OF AMERICA, et al.,

    Plaintiffs,

    v.                                                   Case No. 2:18-CV-127 JD

UNITED STATES STEEL
CORPORATION,

    Defendant.

## OPINION AND ORDER

Federal and state environmental regulators were put on alert in April 2017 when the United States Steel plant in Portage reported a large release of dangerous chemicals into a waterway that flows into Lake Michigan and sits adjacent to Indiana Dunes National Park. The regulators investigated the release and found that the steel plant had a history of environmental violations stretching back to 2013. The federal government and Indiana initiated enforcement proceedings over the violations. Two other parties with interests in the outcome of the enforcement action, the City of Chicago and the Surfrider Foundation, soon intervened in the case. The governments and U.S. Steel negotiated a revised consent decree to resolve the case that they insist properly responds to the violations. They now ask this Court to enter the decree despite intervenor and public opposition. After weighing the extensive record, the Court determines the decree should be entered for the following reasons.[1]

## I.  Factual Background

[1] The Court notes that this case was reassigned from Judge Theresa Lazar Springmann to Judge Jon E. DeGuilio on January 25, 2021. (DE 78.)

United States Steel is a corporation whose business includes running a steel manufacturing and finishing facility in Portage, Indiana, known as the Midwest Plant ("Facility"). (DE 1 ¶ 55, 56; DE 47-1 at 3.) The Facility is located adjacent to Lake Michigan and Indiana Dunes National Park and, as part of its operations, discharges stormwater and wastewater into an industrial ditch known as Burns Waterway that then, within approximately 500 feet, feeds directly into Lake Michigan. (DE 1 ¶ 57; DE 47-1 at 3.) U.S. Steel's discharges into Burns Waterway are subject to a host of governmental regulations that, among other things, require U.S. Steel to ensure regular quantitative and narrative oversight and reporting, properly maintain its facilities and systems, and advise of violations. (DE 1 at 10–12; DE 47-1 at 4–5.) U.S. Steel is alleged to have frequently violated these requirements from 2013 through 2017. (DE 1 at 30–31.) This case, filed in April 2018, and the revised consent decree this order considers are a response to those violations.

### A. Parties

While this case has drawn comments from a wide swathe of the public in the approximately three years it has been pending, the actual parties are more finite. The case originated as an action by the United States and the State of Indiana (together "Government Plaintiffs") against U.S. Steel. The federal government filed the case on behalf of the Environmental Protection Agency ("EPA"), the National Park Service ("NPS") of the United States Department of the Interior, and the National Oceanic and Atmospheric Administration ("NOAA") of the U.S. Department of Commerce. The State of Indiana filed on behalf of the Indiana Department of Environmental Management ("IDEM") and the Indiana Department of Natural Resources. (DE 47 at 1.) Each of the sub-entities the Government Plaintiffs represent

have played a role in the detection, analysis, or negotiation process that led to the proposed consent decree now before the Court.

At the time the Government Plaintiffs filed their suit in April 2018, two other entities were in the early stages of pursuing their own litigation over the same issues. The Surfrider Foundation, a non-profit corporation with a national reach that aims to protect the world's oceans, waves, and beaches, and the City of Chicago ("City"), which draws its drinking water from Lake Michigan, had each filed their own lawsuits several months before the Government Plaintiffs filed this action. (DE 20 at 1.) Both Surfrider and the City sought to intervene in this lawsuit (DE 12; DE 13), and the Court granted their motions (DE 20).

### B. Pre-enforcement violations

The Facility manufactures steel sheet and tubular products using a variety of processes that, if not properly controlled, can have a negative impact on the environment. The Facility is permitted to release wastewater with certain amounts of chemicals and other potential pollutants that would otherwise represent violations of the Clean Water Act ("CWA"), but it must do so within the confines of its National Pollution Discharge Elimination System ("NPDES") permit, which sets limits based on state and federal regulations. Indiana has the delegated authority from the EPA to issue the permit and both state and federal regulators can then monitor the Facility to see if it is abiding by the terms of its permit. (DE 47-1 at 4.) The Facility has two water treatment plants it uses during its manufacturing process to comply with the requirements. (*Id.* at 3.)

The catalyst event for this action occurred in April 2017 when U.S. Steel personnel noticed discoloration in wastewater within the Facility and saw a bluish-green tint to the water leaving the Facility and flowing into Burns Waterway. (*Id.* at 4; DE 50-3 at 12.) Upon inspection, personnel concluded that a wastewater line carrying chrome waste in the Facility had

failed and caused the water to be sent not to the designated treatment facility for chrome waste but instead to the plant that was not capable of such treatment. (DE 50-3 at 21–22.) The wastewater passed through the plant untreated and then flowed into Burns Waterway. (*Id.*) Sampling done at the time indicated that the wastewater that passed through the Facility contained dangerous chromium compounds including roughly 300 pounds of hexavalent chromium, which can have very serious effects on humans and the environment. (*Id.* at 18–19, 21–22.) U.S. Steel alerted the regulators that it had observed the problem and EPA and IDEM personnel responded. Downstream users like the city of Portage and town of Ogden Dunes were not alerted, however, until Indiana officials made the notifications. (*Id.* at 12–13.)

Both state and federal regulators determined during their investigation following the April 2017 spill that U.S. Steel had violated environmental laws and regulations. Specifically, the regulators found violations of several CWA provisions and corresponding Indiana state regulations in the form of greater effluent discharges than were allowed under the Facility's NPDES permit. They found that the violations were not the result of blatant decisions to dump large quantities of harmful chemicals into the waterway, but instead more indirectly stemmed from internal Facility failures caused by a lack of preventative maintenance, poor condition of equipment and materials within the Facility, and lacking management procedures that led to inadequate inspection activities and inadequate routine monitoring of the equipment. (DE 47-2 at 15–26.) Additionally, because the discharge involved a large enough amount of chromic acid that went unreported to regional stakeholders, the regulators found U.S. Steel violated the Emergency Planning and Community Right-to-Know Act of 1986 ("EPCRA"). (DE 47-1 at 4.) Further the EPA incurred $350,653.20 in response costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the NPS incurred

response costs under the System Unit Resources Protection Act ("SURPA"), and the NOAA incurred costs under CERCLA in conducting natural resource damage assessments at and in the area around the Facility. NPS also incurred damages for the costs of assessing the risk to Indiana Dunes National Park and from the lost use of national park beaches that were closed for several days after the spill. (*Id.*)

The April 2017 spill also prompted state and federal regulators to look for other NPDES permit violations at the Facility. Regulators found a host of prior violations beginning in February 2013. (DE 1 at 30–31; DE 47-1 at 4–5.) The violations included permit effluent exceedances for several non-chrome pollutants, narrative standard problems stemming from discharges of discolored water, monitoring and reporting violations, improper operation and maintenance of systems used to collect and treat wastewater, and stormwater pollution prevention plan violations. (DE 1 at 30–31; DE 47-1 at 4–5.)

The Facility then experienced another effluent exceedance in October 2017 when it again violated its chromium discharge limits because of what U.S. Steel reported were failures with visual inspections within the Facility, failures in having proper pathing to carry the wastewater at issue, and improper maintenance of the equipment it did have. (DE 50-2 at 73–74.) Aware of this most recent violation and the preceding violations, including the April 2017 spill, the Government Plaintiffs engaged U.S. Steel in negotiation discussions in anticipation of filing the current enforcement action.

### C. The negotiations and the decree

The Government Plaintiffs' information gathering and preliminary discussions with U.S. Steel began immediately after the April 2017 spill and stretched through the spring and summer of 2017. Following an in-person meeting between the parties in September 2017, the actual

negotiations picked up with special attention paid to the information U.S. Steel had submitted to the government agencies, U.S. Steel's existing permit requirements, and U.S. Steel's existing operations and maintenance plans. (DE 47-1 at 5.) The Government Plaintiffs describe the process, which lasted until this action was filed in April 2018, as "arms-length over a number of months" with "substantial give-and-take by experienced environmental lawyers and technical experts representing the United States, the State, and U.S. Steel." (*Id.*) At the same time, U.S. Steel took several steps to address some of the root causes of the April 2017 spill, including replacing a concrete trench that had failed to contain the leaking chromium wastewater and installing stainless steel pipes for use in the chromium treatment process. (DE 46-1 at 15–16; DE 47-1 at 5.)

The negotiations eventually resulted in the first version of the consent decree, which the Government Plaintiffs filed simultaneously with their complaint. (DE 1; DE 47-1 at 5.) That first version of the decree was the subject of an extended public comment period. The parties received approximately 2,700 public comments on the decree, many of which argued there were changes that needed to be made before the decree could be effective. (DE 47-5.) After receiving those comments, the Government Plaintiffs and U.S. Steel worked to revise the initial decree and created the updated version now before the Court.

While the consent decree underwent several important changes over time, the core of the decree has remained the same since it was first proposed. The decree's stated objective is to "cause U.S. Steel to take those steps that are necessary to bring the U.S. Steel's Midwest Plant Facility into compliance with" its environmental responsibilities. (DE 46-1 at 7.) It proposes to achieve that objective in several ways, including by requiring three main plans to help run the Facility, imposing mandatory notification requirements and stipulated penalties should violations

occur, and imposing a civil penalty. (DE 46-1; DE 47-1 at 5–6.) It also imposed mandatory infrastructure upgrades, which U.S. Steel undertook soon after the April 2017 spill and while the decree was being negotiated. (DE 47-1 at 7.)

The three plans the decree requires U.S. Steel to develop address the key areas in the Facility's operational standards the Government Plaintiffs found lacking during their review of the company's prior compliance. First, the decree requires that U.S. Steel create a Comprehensive Wastewater Operations and Maintenance Plan ("O&M Plan"). The O&M Plan is designed to ensure that U.S. Steel will properly operate and maintain all of its wastewater treatment process equipment within the Facility. Second, the decree requires a related Preventative Maintenance Program Plan ("PM Plan") that is designed to help prevent breakdowns and improve efficiency within the Facility's wastewater infrastructure. And third, the decree requires a Wastewater Process Monitoring System ("Wastewater System") that covers early detection of conditions that could precipitate spills like the April 2017 spill or other discharges that would violate U.S. Steel's permit limits. The Wastewater System also sets standards and goals to ensure that new and improved monitoring equipment and technologies are installed when needed to improve Facility wastewater monitoring. (DE 47-1 at 5–6, 16.)

U.S. Steel created and submitted the O&M and PM Plans to the EPA and IDEM in April 2018, prior to the close of the public comment period on the entire decree. EPA and IDEM did not approve those initial plans, in part based on their consideration of public comments they had received to that point, and informed U.S. Steel about the areas for needed improvement. (*Id.* at 8.) U.S. Steel then came back with updated versions of the two plans that the government agencies approved in December 2018. Those updated versions included additional operational procedures aimed at avoiding and minimizing spills from the Facility's treatment plants, a

reference list of all standard operating procedures ("SOPs") related to monitoring compliance with the NPDES permit, more descriptions of how U.S. Steel would be managing and documenting activities under the Plans, and language specifically describing how it plans to inspect, clean, and maintain the outflow channel as well as how it will track those activities. (DE 47-1 at 8.)

U.S. Steel also had its Wastewater Monitoring Design approved after receiving feedback from the state and federal regulators as well as considering public comments related to the document. Many of the comments came from the intervenors in this case, who had received a 30-day extension on the normal filing deadline. (*Id.* at 16–17; DE 47-2 at 6–8.) The revised Wastewater Monitoring Design included detailed recommended actions to improve wastewater process monitoring for early detection of potential spills as well as to prevent future discharges that would exceed permit limits. It also included an assessment of the root causes that led to the April 2017 spill. (DE 47-1 at 16.) Key changes U.S. Steel made in the revised version that received approval included a schedule for completing installation of all monitoring equipment, specifications for all monitoring equipment, and a status update for its planned activities. (DE 47-2 at 8.)

In addition to the three core plans, the revised consent decree kept the originally proposed civil penalty and stipulated penalties. The civil penalty to be imposed totals $601,242 in the form of two $300,621 payments, one to the United States and one to Indiana. The stipulated penalties are tied to the type and frequency of any future violation and are designed to be imposed as penalties on a per-violation and per-day basis. (DE 46-1 at 35–37.) The decree additionally requires U.S. Steel to pay back the response costs the various government agencies incurred when responding to the April 2017 spill (*Id.* at 31–34), imposes various reporting requirements

for updates from U.S. Steel on its progress and compliance (*Id.* at 28), and requires daily chromium sampling and reporting of those results to IDEM. (*Id.* at 20–21.)

Further, the Government Plaintiffs and U.S. Steel made two larger revisions to the decree in response to public comments before moving to enter it. First, they greatly revamped Appendix B to the decree, which lays out the Facility's notification requirements when there has been a spill or unauthorized release. The changes added far more specificity to the requirements as well as specifically listed the parties U.S. Steel is required to notify in the event of a violation. (DE 46-2 at 63–65.) Second, the Government Plaintiffs added a completely new Environmentally Beneficial Project ("EBP"), which requires U.S. Steel to perform water quality sampling at the shoreline of seven locations near the Facility, including directly around the Facility, around Indiana Dunes National Park, and near Michigan City, Gary, and Ogden. (*Id.* at 21.) The sampling is to be completed on either a weekly or monthly basis, depending on time of year, and any results are to be made publicly available. (*Id.* at 22–23.) U.S. Steel estimates that it would spend approximately $600,000 over the three-year duration of the EBP. (DE 47-1 at 37.)

### D. Post-enforcement violations

Even though U.S. Steel was not required to abide by the technical requirements in the government-approved O&M and PM Plans before the decree was officially entered, the company decided to start voluntarily complying anyway after the plans were approved at the end of 2018. But despite the voluntary compliance, the Facility still experienced NPDES permit violations in late 2018 and through 2019.

In November 2018, state inspectors found that the Facility was releasing visible foam and scum into Burns Waterway. (DE 50-1 at 69.) The investigators returned over the ensuing days but did not see additional foaming. A sample of the water carrying the foam and scum showed

that while it was present, all effluent discharges were within the limits specified in the NPDES permit. (*Id.* at 70; DE 64 at 5.) The Facility again received a complaint about discharging foam in December 2018. When state officials arrived, they saw limited foaming and again found no effluent limit violations. U.S. Steel attributed the foaming problems to insufficient use of a new defoaming agent the Facility was using.(DE 50-1 at 87–88; DE 64 at 6.)

Several more violations occurred throughout the spring and summer of 2019. In early May 2019, U.S. Steel notified state officials that it was noticing discolored water with a thin sheen flowing from the Facility into Burns Waterway. (DE 50-1 at 89.) When officials initially asked U.S. Steel about the source of the problem, U.S. Steel personnel told them it was excessive iron and acid used to clean metals as they were being manufactured. (*Id.* at 90.) Five days later, U.S. Steel issued a report to the state officials notifying them that the real problem appeared to be a sulfuric acid release, which had not been previously reported either to IDEM or downstream users despite evidence suggesting U.S. Steel was aware of the cause several days beforehand. (*Id.* at 91–93.) There were no effluent limit violations reported from the incident. (*Id.* at 91–93; DE 64 at 7.)

U.S. Steel then had more problems in August with reports of oil sheens showing up in outflows, improper keeping of records on temporary paper notes, a need to revise its operations manual for one of its treatment plants, and inaccurate reporting of outflow temperatures. (DE 50-1 at 104–106.) U.S. Steel, in letters to state regulators did appear to have answers for why these problems occurred and offered steps it planned to take to prevent them in the future. (*Id.* at 116–17; DE 64 at 7–9.)

U.S. Steel then had several more violations before the end of 2019. It exceeded its copper discharge limits on two occasions (DE 50-1 at 57–60), allowed wastewater with an oil sheen to

be discharged on one occasion (*Id.* at 123–24), and reported a violation involving water discoloration and a likely loss of solids into Burns Waterway (*Id.* at 133–34). U.S. Steel attributed the additional oil sheen problems, water discoloration, and loss of solids to equipment problems that it had plans to repair. The Facility also had another violation related to a hexavalent chromium discharge it reported to regulators in October 2019, although on a far smaller scale than it did in April 2017. Upon discovering the discharge, U.S. Steel immediately shut down the relevant production lines and notified government agencies, downstream users, and other stakeholders. (*Id.* at 123–24, 129.) It attributed the hexavalent chromium event to operator error within the Facility that exacerbated a problem with inadequate chemical feed that was meant to treat the hexavalent chromium before it reached Burns Waterway. It also explained in detail to regulators how it planned to fix the problem for the future. (*Id.* at 123–24; DE 64 at 9–10.) No parties have filed any documents to suggest there have been any violations since the end of 2019 despite having the opportunity, as seen through the parties' filings on other topics as this case remained pending, to do so.

### E. The litigation over the revised decree

The Government Plaintiffs moved to enter the revised consent decree in November 2019, arguing it not only would respond to the past violations and bring the Facility into compliance with its NPDES permit requirements, but also that it adequately reflected the large amount of feedback the public and intervening parties had given throughout the course of its development. (DE 46; DE 47.) The Government Plaintiffs filed several attachments with their briefing, including affidavits from EPA, IDEM, and NPS experts attesting to the expected success of the consent decree. Both the City and Surfrider filed responses to the Government Plaintiffs' motion in December 2019, urging the Court not to approve entering the consent decree for a variety of

reasons, including its inadequate technical provisions, a civil penalty that was too low, and a lack of protection for the public. (DE 50; DE 51.) Surfrider filed approximately 640 pages of additional exhibit material along with its briefing, including an affidavit from a hired expert giving his opinion about the decree. The City filed several smaller exhibits, including an opinion from its own hired expert. (DE 52; DE 52-2.)

The Court also received additional filings related to the consent decree both from Surfrider and several non-parties to this case. Surfrider filed a notice of supplemental authority (DE 74) alerting the Court to the Supreme Court's decision in *County of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1465 (2020) and how it broadens the ability of a regulator to pursue environmental damage from groundwater contamination. The Court also received a joint letter from numerous public interest groups from the northern Indiana region (DE 54) and an amicus brief from the National Parks Conservation Association (DE 80). Additionally, both Surfrider and the City filed an additional motion asking that the Court hold an evidentiary hearing or, in the alternative, allow oral argument to explore factual issues they believe still exist related to the decree. (DE 90; DE 94.)

## II.   Standard of Review

Approval of a consent decree is a judicial act committed to the sound discretion of the district court. *Madison County Jail Inmates v. Thompson*, 773 F.2d 834, 845 (7th Cir. 1985); *see also United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1019 (8th Cir. 2002). A district court reviews a consent decree to determine whether it is fair, adequate, reasonable, and consistent with applicable law. *See United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011), *as amended* (June 17, 2011); *United States v. Union Elec. Co.*, 132 F.3d 422, 430 (8th Cir. 1997); *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1435 (6th Cir.

1991); *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985). Of particular importance in that analysis is determining whether a proposed decree adequately protects and is consistent with the public interest. *United States v. BP Expl. & Oil Co.*, 167 F. Supp. 2d 1045, 1049 (N.D. Ind. 2001).

In analyzing the decree before it, the Court should be aware of the policy favoring approval. Public policy strongly favors voluntary settlement of disputes without litigation. *Cannons*, 899 F.2d at 84. And that policy is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal agency, like the EPA, which enjoys substantial expertise in the environmental field. *See Whiting Paper*, 644 F.3d at 372; *Akzo*, 949 F.2d at 1426; *see also E.E.O.C.*, 768 F.2d at 890 ("a district court should be chary of disapproving a consent decree"). But that deference to the Government's judgment should by no means be a rubber stamp. *BP Exploration*, 167 F. Supp. 2d at 1050 (citing *Kelley v. Thomas Solvent Co.*, 717 F. Supp. 507, 515 (W.D. Mich 1989)). Instead, the Court must conduct an individual evaluation based on the particular facts of the case but with caution not to substitute its judgment for that of the parties or engage in the type of detailed investigation that would be required if the parties were trying the case. *Id.* (citing *Akzo*, 949 F.2d at 1434).

## III.   Discussion

The parties on either side of this consent decree offer strongly divergent views of the future it will create for U.S. Steel, Indiana Dunes National Park, and the rest of the region abutting Lake Michigan. The Government Plaintiffs, along with U.S. Steel, insist that the decree and the requirements it places the Facility under will bring the Facility into compliance with its permit. Surfrider and the City, however, foresee a future where U.S. Steel continues its polluting

13

under the decree's too lax requirements to the detriment of the public and the regional environment. The decree's stated objective is to "cause U.S. Steel to take those steps that are necessary to bring U.S. Steel's Midwest Plant Facility into compliance with" the environmental regulations imposed upon it. (DE 46-1 at 7.) This opinion determines how well the decree meets that stated objected and whether it does so in a way that is fair, reasonable, adequate, and consistent with applicable law.

### A. Intervenors' requests for additional hearing

Before getting into the merits of the revised decree specifically, the Court first addresses the intervenors' requests that the Court hold an evidentiary hearing or allow for oral argument. Surfrider was the primary advocate for an additional hearing (DE 90), with the City later joining the request (DE 94). Surfrider argued that an additional hearing was necessary because the Government Plaintiffs' filings in support of the decree "fail to address adequately many factual issues relevant to the questions before the Court." (DE 90 at 2.) The specific issues Surfrider highlighted as needing more explanation were what it claims are the decree's inadequate technical provisions, failure to sufficiently protect Indiana Dunes National Park, and a substandard civil penalty. (*Id.*; DE 68 at 4.) Surfrider envisioned the parties having the chance to cross-examine various experts, hear from U.S. Steel employees, and otherwise press U.S. Steel and the Government Plaintiffs on those aspects of the revised decree the intervenors still believe are lacking. U.S. Steel opposed both an evidentiary hearing and oral argument given what it argued was an already extensively briefed, voluminous record. (DE 66.) The Government Plaintiffs opposed an evidentiary hearing for similar reasons but stated they "would not object" if the Court found an oral argument necessary. (DE 63 at 5.)

The decision to hold an evidentiary hearing or schedule an oral argument is a discretionary one for the Court. *See Union Electric*, 132 F.3d at 430; *United States v. Metro. St. Louis Sewer Dist (MSD)*, 952 F.2d 1040, 1044 (8th Cir. 1992); *Cannons*, 899 F.2d at 94; N.D. Ind. L.R. 7-5(c)(1) ("The court may . . . grant or deny a request for oral argument or an evidentiary hearing in its discretion"). While some courts have found it helpful to hold additional hearings in environmental consent decree cases, *see, e.g.*, *United States v. City of Akron*, 794 F. Supp. 2d 782, 787 (N.D. Ohio 2011); *B.P. Exploration*, 167 F. Supp. 2d at 1049, many courts have held that additional hearings are unnecessary. That is particularly true when there is already an extensive record, when there is evidence that every party has had an opportunity to be heard, and when there are no unexplored topics essential to the Court's final decision. *See Union Electric*, 132 F.3d at 430; *United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1085 (1st Cir. 1994) (noting "requests for evidentiary hearings are, for the most part, routinely denied—and properly so—at the consent decree stage in environmental cases" and compiling cases). "[T]he test for granting a hearing should be substantive: given the nature and circumstances of the case, did the parties have a fair opportunity to present relevant facts and arguments to the court, and to counter the opponent's submission?" *Cannons*, 899 F.2d at 94 (internal quotation omitted).

While the Court understands the intervenors' concerns and has weighed their arguments for an additional hearing carefully, it does not find one necessary. The intervenors and the public have already had repeated opportunities to provide the Court with their opinions and to submit any evidence they believed pertinent. The public, including the intervenors, participated in the public comment period on the initially proposed decree, which saw 2,700 comments filed. (DE 47-5.) The intervenors then were able to submit briefing on the revised consent decree to explain

their opposition, which they ably did. They further had the opportunity to submit any supporting evidence to the Court they thought relevant, which they did in the form of approximately 650 pages of attachments made up of expert reports, affidavits, and other exhibits. Finally, both the intervenors and the public have had the opportunity to submit any additional documentation to the Court outside of briefing as they thought applicable. In that respect, the Court has before it an amicus brief from the National Parks Conservation Association (DE 80), a joint letter from numerous northern Indiana organizations (DE 54), and a notice of supplemental authority from Surfrider (DE 74). All these materials that make up the current record convince the Court that the intervenors and public have had a sufficient opportunity to be heard without holding additional hearings and provide an adequate basis upon which to evaluate the decree.

What is more, the Court finds that Surfrider's and the City's reasons for holding a hearing are not new but instead simply mirror the same reasons they already extensively and capably briefed in their filings before the Court. For example, Surfrider's reply to its motion for additional hearing reads as a recitation of the arguments and reasoning already contained in its response to the Government Plaintiffs' motion to enter the decree. (DE 50; DE 68.) The Court is well aware of Surfrider's and the City's positions about the decree's alleged failings and does not believe a new hearing, either evidentiary or to hear oral argument, is necessary before moving on to consider the consent decree. The Court thus moves to consider the extensive record and briefing before it to determine whether the decree is fair, reasonable, adequate, and consistent with applicable law.

### B. Fairness

A court's fairness analysis for a consent decree is comprised of two prongs, procedural fairness and substantive fairness. *BP Exploration*, 167 F. Supp. 2d at 1051 (citing *Cannons*, 899

F.2d at 86). Procedural fairness focuses on the negotiations process, specifically whether it was open, at arms-length, and involved balanced bargaining. *Id.*; *see also United States v. Bayer Healthcare, LLC*, 2007 WL 4224238, at *3 (N.D. Ind. Nov. 28, 2007). Substantive fairness "concerns concepts of corrective justice and accountability." *Id.* The Court evaluates fairness from the standpoint of signatories and non-parties to the decree. *Akzo*, 949 F.2d at 1435; *BP Exploration*, 167 F. Supp. at 1052.

### 1. Procedural fairness

There is nothing in the record or from any parties to the case to make the Court doubt the Government Plaintiffs' statement that the terms of the decree "were negotiated at arms-length over a number of months, with substantial give-and-take by experienced environmental lawyers and technical experts" on both sides. (DE 47-1 at 5.) The Government Plaintiffs took several months to gather evidence and determine the scope of violations after the April 2017 spill and only began serious negotiations after they had that information. (*Id.*) The Government Plaintiffs and U.S. Steel then took from September 2017 to April 2018 to negotiate the first version of the decree. (*Id.*; DE 1.) And after filing the proposed decree, they solicited, evaluated, and made changes based on the roughly 2,700 public comments they received over an extended comment period. *See United States v. Lexington-Fayette Urban Cty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (recognizing government's good faith in considering all comments to proposed decree); (DE 65 at 11–12).

Additionally, while it is true that Surfrider and other non-parties to the decree did not directly participate in the negotiations (DE 47-5 at 107), direct participation by third parties is not required. *BP Exploration*, 167 F. Supp. 2d. at 1052. Further, the record shows non-parties were kept abreast of the negotiations and that their lack of direct participation did not dilute their

ability to influence the decree. (DE 47-1 at 13–14, 17–19, 25–31, 33–39, 41, 43.) Given those facts, the Court concludes the negotiations process was procedurally fair.

### 2. Substantive fairness

The Court also finds the revised decree substantively fair while acknowledging the intervenors' strong belief otherwise. The Seventh Circuit, evaluating consent decrees in other areas of law, has listed several factors for determining substantive fairness. Those factors are: 1) a comparison of the strength of the plaintiff's case with the extent of the settlement offer; 2) the likely complexity, length, and expense of litigation; 3) the amount of opposition to the settlement among affected parties; 4) the opinion of counsel; and 5) the stage of the proceedings and amount of discovery already undertaken at the time of the settlement. *Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982); *see also EEOC*, 768 F.2d at 889 (restating factors). The first factor is the most important, *EEOC*, 768 F.2d at 889, so the Court begins and focuses much of its analysis there.

### a. Strength of case versus extent of the settlement offer

The Government Plaintiffs have a strong case against U.S. Steel given U.S. Steel has already admitted to many of the violations the Government Plaintiffs and intervenors have alleged. (DE 87; DE 88). U.S. Steel has also been cooperative in the enforcement process to date. But while the company has made those admissions and been amenable to negotiating up to this point, it has certainly not admitted to all the violations alleged against it and could very easily take a more adversarial approach should the case proceed toward trial. The revised decree must thus reflect the Government Plaintiffs' strong case and bargaining position, but it need not amount to the relief the Government Plaintiffs could have achieved through fully litigating this

matter. *See EEOC*, 768 F.2d at 889–90 (recognizing that "[e]ach side gains the benefit of immediate resolution . . . and some measure of vindication for its position while foregoing the opportunity to achieve an unmitigated victory").

In determining the appropriateness of the extent of the decree in light of the strength of the Government Plaintiffs' case, the Court first considers the civil penalty portion of the decree as that proved to be a central area of disagreement between the parties to the decree and the intervenors. Under the decree, U.S. Steel would be required to pay a $601,242 civil penalty split evenly between the federal government and Indiana. (DE 46-1 at 35.) The Government Plaintiffs and U.S. Steel argue that penalty is sufficient and substantively fair given the facts of the case and the other provisions in the decree. (DE 47 at 11–13, 21–23; DE 64.) The intervenors and a number of public comments disagreed, arguing the civil penalty is too low and makes the decree substantively unfair. (DE 47-1 at 33–35; DE 50 at 17–23; DE 52 at 7–9.)

Civil penalties in environmental cases are not an exact science. *See United States v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, 281 (1st Cir. 2000) (holding concepts like amount of a penalty imposed "do not lend themselves to verifiable precision"). And courts have held that the EPA can "depart from rigid adherence to formulae wherever the agency proffers a reasonable good-faith justification for departure." *Cannons*, 899 F.2d at 88 ("we are confident that Congress intended EPA to have considerable flexibility in negotiating and structuring settlements"); *see also Comunidades Unidas*, 204 F.3d at 281 (applying *Cannons* and holding that "[i]n environmental cases, EPA's expertise must be given the benefit of the doubt when weighing substantive fairness") (internal quotations omitted).

With that flexibility in mind, there is still guidance available to courts and regulators to ensure a fair penalty is achieved. Section 309(d) of the CWA instructs a court evaluating a civil

penalty to consider "the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require." 33 U.S.C. § 1319. Specific EPA-issued guidance for CWA violations, though purely advisory and not binding on the regulators, similarly advises considering the economic benefit and gravity of the violations as well as weighing litigation considerations, the violator's ability to pay, and any supplemental environmental projects.[2] U.S. Env't Prot. Agency, Interim Clean Water Act Settlement Penalty Policy 4, 23 (1995) ("EPA Settlement Policy").

The Court finds that the civil penalty and the Government Plaintiffs' reasoning for the amount is appropriate given that guidance. First, the Government Plaintiffs clearly considered the economic benefit to U.S. Steel in allowing the violations to occur. In doing so, they noted that the economic benefit, while present, was not very high given the violations resulted primarily from poor personnel and operating procedures as opposed to foregoing larger scale expenditures. (DE 47-1 at 35.) That observation is supported by the Court's review of the record, which shows some cost savings from not spending to replace certain infrastructure but that many of the violations stemmed more centrally from poor reporting procedures and personnel errors. (DE 1; DE 47-2.) Further, the Government Plaintiffs took U.S. Steel's failure to replace infrastructure and other cost savings into account, ensuring that the civil penalty "fully recovers the economic benefit that U.S. Steel obtained as a result of avoided or delayed expenditures needed to address the violations." (DE 47-1 at 33.) Second, the Government Plaintiffs considered

---

[2] The Government Plaintiffs stated they included the new EBP in the revised decree without considering the cost to U.S. Steel of implementing it in penalty mitigation. (DE 47 at 14–15.)

the seriousness of the violations as well as the number of violations alleged, deciding that the violations stemming from the April 2017 spill deserved the most weight because they were the most serious. (DE 1 at 30–31; DE 47 at 11–14, 22; DE 47-1 at 33–35.) The Court also finds that decision to account for all violations but increase the penalty most because of the magnitude of the 2017 violations reflects the factual record. The Court does note that the Government Plaintiffs did not provide a specific, per-violation calculation, but the Court does not find one necessary given the flexibility regulators have in determining penalties and the mitigating factors the Government Plaintiffs considered in imposing a penalty that they admitted is lower than it would be on a straight, per violation calculation.

One reason the Government Plaintiffs gave for what is ultimately a lower penalty was U.S. Steel's good faith efforts shown by participating in negotiations, quickly starting to remedy the problems at the Facility, and voluntarily complying with the terms of the decree before it was entered. (DE 47-1 at 33.) That good faith participation, while coming on the heels of a long string of violations, greatly sped the process for compliance along, made it more likely that dangerous conditions in the region's waters would be minimized as the enforcement action proceeded, and saved the Government Plaintiffs time and resources. *See Cannons*, 899 F.2d at 88 (discussing the need to encourage early, cost-effective settlements and account for the benefits of them). (DE 47 at 22; DE 47-1 at 33–34.) There were thus clear benefits to that compliance that the Government Plaintiffs understandably considered in the penalty calculation.

Additionally, the Government Plaintiffs properly factored litigation considerations into their penalty determination. EPA Settlement Policy at 4; (DE 65 at 13–14.) Surfrider is correct that the Government Plaintiffs did not fully explain their specific litigation considerations (DE 50 at 19), but the Court does not find an accounting of the considerations necessary given the

Government Plaintiffs' privilege concerns (DE 65 at 14–15) and interest in not broadcasting their litigation strategies. *BP Exploration*, 167 F. Supp. 2d at 1052 ("the Government is under no obligation to telegraph its settlement offers, divulge its negotiating strategy, or surrender the normal prerogatives of strategic flexibility which any negotiator cherishes"). The Court also disagrees with Surfrider's suggestion that given the Government Plaintiffs' strong case against U.S. Steel, there is no rationale here where litigation considerations could lead to a lower penalty. (DE 50 at 19.) The Government Plaintiffs have a strong case, but U.S. Steel has not admitted to every violation and thus could still mount a defense that leads to not only a potentially less favorable outcome for the Government Plaintiffs, but also cause the loss of time, money, and degree of certainty that the Facility will be operating within its permit requirements on a faster timeline and be protecting both parties and non-parties in the region. These litigation considerations are certainly relevant in calculating the ultimate penalty assessed.

Finally, the Court did not find any case from Surfrider (DE 47-5 at 124) or elsewhere that suggests the Government Plaintiffs' decision to impose a $601,242 civil penalty based on their consideration of the specific facts and circumstances, including the economic impact on U.S. Steel and how the penalty fits into the overall scope of the decree, is inconsistent with other penalties or will create a regional inconsistency in imposed penalties. The civil penalty amount may not be as much as the intervenors would have sought or what the Government Plaintiffs may have received through more extensive litigation. But the Court finds the Government Plaintiffs, with their flexibility and expertise on these topics as well as their understandable decision to settle instead of pursuing further litigation, sufficiently justified their calculation methodology, adhered to the standards guiding such consideration, and weighed the relative strength of their case in arriving at a substantively fair amount.

Having considered the civil penalty and determined that it is substantively fair under the circumstances, the Court also notes that the penalty is only one aspect of the decree and thus does not on its own determine whether the extent of the decree is substantively fair. For example, the civil penalty is just one of multiple penalties and payments enumerated in the decree. The decree also requires U.S. Steel to pay approximately $644,000 in statutorily mandated costs associated with the assessment and monitoring that various government organizations had to incur following the April 2017 spill (DE 46-1 at 31–34), as well as imposes stipulated penalties on U.S. Steel for any violations at the Facility should they occur after the decree is entered. Both of those payment components contribute to the decree's substantive fairness.

Further, the decree would impose a host of non-monetary requirements on U.S. Steel that reflect the strength of the case against the company. Those requirements include creating and abiding by the three core plans that fundamentally reform how the Facility is run, establishing new, far more thorough notification requirements in the event of a violation, running a three-year, $600,000 water sampling project that the Government Plaintiffs likely could not have obtained through further litigation (DE 65 at 12), and agreeing to periodically submit reports to regulators about progress at the Facility, new compliance problems, and ideas for continued improvement. The Court also notes that the Facility cannot get out of the decree easily given that the decree can only end through court order after U.S. Steel shows it has been in full compliance with the decree for two years. And even then, U.S. Steel would have to have the core aspects of the decree included as requirements in its NPDES permit, ensuring the decree's continued operative value. The fact that the Government Plaintiffs could get U.S. Steel to agree to this fundamental reforming of its procedures, the thorough oversight provisions, and the civil penalty

and other payments reflects the strength of the Government Plaintiffs' case and thus the substantive fairness of the decree.

### b. Other substantive fairness considerations

While that first, most important, consideration supports a finding that the revised decree is substantively fair, the other considerations that go into a substantive fairness analysis, when weighed together, also support such a finding. First, any litigation in this case would likely be complex, lengthy, and expensive given the technical nature and number of violations, even though U.S. Steel has already admitted to certain violations. That complexity and cost suggests that a comprehensive consent decree like the one now before the Court provides a fair resolution.

Second, while there was and continues to be public opposition to entry of this decree, the Government Plaintiffs and U.S. Steel addressed key public concerns by revising the decree to account for the concerns and make sure it is fair not only for the parties but also to the non-parties in the region who have a stake in this action's outcome. For example, the Government Plaintiffs strengthened the O&M Plan, added the EBP, greatly fleshed out the notification requirements for any violations that might occur, and demanded revisions to U.S. Steel's initially proposed plans all in response to public comments. *EEOC*, 768 F.2d at 892 (holding that a large number of objectors holds minimal weigh absent other factors); (DE 46-2; DE 47-1).

Third, the Court has also considered the opinions of counsel. Counsel for the parties to the decree, who are presumed to be competent, clearly support the decree as their clients stand ready to be bound by it. *See Bayer Healthcare*, 2007 WL 4224238, at *4. The Court does note that the intervenors' counsel, who are likewise presumed to be competent, oppose the revised decree, which somewhat negates the parties' counsels' approval. But that disagreement between counsel at most makes this a neutral factor.

And fourth, although the case is technically still in the early, pre-discovery phase of litigation, the information available to the parties as they came to this revised decree was expansive and the result of the Government Plaintiffs having engaged closely with U.S. Steel for approximately a year between the April 2017 spill and the April 2018 filing of this action. The Court is assured that the record is sufficiently substantial at this point for the parties to have thoroughly assessed the merits of their positions and reached a substantively fair settlement. Thus, having considered all the factors, the Court concludes the revised decree represents corrective justice and ensures accountability in a substantially fair manner.

### C.     *Reasonableness, adequacy, consistency with applicable law*

The Court next evaluates whether the revised decree is reasonable, adequate, and consistent with applicable law. In doing so, it considers: 1) the nature and extent of potential hazards; 2) the availability and likelihood of alternatives to the consent decree; 3) whether the decree is technically adequate to accomplish the goal of cleaning the environment; 4) the extent to which the decree is consistent with applicable law; 5) the extent to which the Court's approval is in the public interest; and 6) whether the consent decree reflects the relative strength or weakness of the Government's case against the Defendant. *BP Exploration*, 167 F. Supp. 2d. at 1053 (citing *Akzo*, 949 F.2d at 1436; *Cannons*, 899 F.2d at 89–90.) The Court takes each consideration in turn.

#### 1. Nature and extent of potential hazards

The hazards at issue in this case encompass impermissible runoff from the Facility directly into Burns Waterway and the Lake Michigan ecosystem. The specific violations included a combination of effluent exceedances, water temperature exceedances, and reporting

25

violations, each of which risk harm to the region's ecosystem and citizens. (DE 1 at 30–31.) Surfrider also claims that this case, and thus the revised decree, should deal with potential groundwater pollution given the Supreme Court decided *County of Maui* (DE 74), which held that groundwater contamination could qualify as source pollution that must be regulated, in the time this case has been pending. 140 S. Ct. 1462 (2020); (DE 74 at 4.) But the Government Plaintiffs specifically did not choose to cover groundwater contamination violations in this case, (DE 47-1 at 21; DE 75 at 2–3), leaving it instead to Indiana alone to bring a separate action should it choose to do so. (DE 75 at 3.) The nature and extent of potential hazards the revised decree must cover thus remains those hazards addressed in the Government Plaintiffs' complaint and comprehensively in the revised decree.

### 2. Availability and likelihood of alternatives

If this revised consent decree is not entered, the Government Plaintiffs and U.S. Steel would be forced to either start the negotiation process for a new decree or forge ahead with what would likely be a lengthy, complex, and unpredictable litigation process. Either alternative would not only keep U.S. Steel from being subject to the requirements of the revised decree now and lessen its incentive to continue voluntarily complying, but would also force the Government Plaintiffs, U.S. Steel, the intervenors, and the judicial system to expend their limited resources as the case continues. Those alternatives suggest a settlement like this revised decree, which ends the litigation while affording relief and protection to the surrounding region, is reasonable and adequate.

### 3. Technical adequacy

The revised decree's reasonableness and adequacy is also clear through its technical requirements. The core of the technical fixes within the decree are the three plans U.S. Steel has already submitted, gotten approved, and starting voluntarily complying with. The first plan is the O&M Plan, which required a list of the Facility's NPDES permit requirements, a description of and operation information for all wastewater treatment process equipment, a compilation of job descriptions or operating duties of assigned personnel, laboratory requirements, recordkeeping requirements, references to all pertinent operation and maintenance forms and procedures, and a plan for proper routine visual inspection, cleaning, and maintenance of outfall channels. (DE 46-1 at 17.) The second plan is the PM Plan, which required compiling procedures and methodologies for periodic inspection and servicing of machinery and equipment, recording of repairs, alterations, and replacements to the Facility's wastewater treatment infrastructure, and at least yearly review and reporting of any necessary modifications to the O&M Plan to be submitted to environmental regulators. (*Id.* at 17–18.) And the third is the Wastewater System plan, which required U.S. Steel to evaluate its existing wastewater monitoring to formulate ways to maximize early detection of conditions that may lead to unauthorized discharges. (*Id.* at 19–20; DE 47 at 6.) In addition to the three plans, the technical requirements imposed also include daily chromium testing (DE 46-1 at 20), extensive public notification requirements (*Id.* at 63–70), required reporting on progress and areas for improvement (*Id.* at 28–31), required repairs of key infrastructure (*Id.* at 15–16), and eventual codification of the core of the decree into the Facility's NPDES permit (*Id.* at 53–54).

The Government Plaintiffs argued that the three plans and other technical provisions contain detailed and comprehensive requirements that directly address conditions that led to past violations and promote future compliance. (DE 47 at 21.) Surfrider and the City were much more

wary. Both intervenors, relying in part on the opinions of retained experts, argued that the violations that occurred after the Facility had supposedly started implementing the three plans show that the plans and other provisions are inadequate. (DE 50 at 8–9; DE 52 at 2–7.) Surfrider also went further, arguing that the decree responded too narrowly to the April 2017 spill and is still missing key components.

The Court finds that the three plans and other technical requirements address the core underlying issues that led to this lawsuit. As the Government Plaintiffs note somewhat regularly in their briefing and attachments, regulators' review of U.S. Steel's non-compliance at the Facility showed that most of the violations in the complaint stemmed from deficiencies in operation and maintenance procedures. (DE 47-1 at 34–35; DE 65 at 4.) It thus stands to reason that a core component of the decree would be a set of plans to address those inadequate procedures and ensure the Facility's proper functioning in the future. The three plans do that by compiling a comprehensive list of standard operating procedures, documenting job and training requirements, ensuring there is regular maintenance, and, when needed, requiring replacement of equipment and technology within the Facility. (DE 47-1 at 34–35; DE 47-2 at 4–8.) The additional technical provisions add to the plans by reforming notification procedures, imposing chromium testing, and ensuring the decree will be in place for a long enough time to ensure sustained compliance. The decree also imposes reporting and regulator oversight requirements beyond those already required through U.S. Steel's permit and other statutes, including semi-annual progress reports, required inclusion of chromium monitoring results in Facility discharge monitoring reports and monthly monitoring reports, and a reservation of right for regulators to enter the Facility at all reasonable times to monitor U.S. Steel's progress with the decree, verify information U.S. Steel has submitted in reports, and obtain sampling and other data as may be

necessary. (DE 46-1 at 20, 22, 28–31, 45.) The Court's review of the nature of violations that occurred before the lodging of the decree, the environmental officials' reports on the violations, and U.S. Steel's own account of why certain violations occurred, all support the Government Plaintiffs' conclusion that these plans and provisions are necessary and get to the heart of the underlying issues.

The Court additionally does not give much weight to the intervenors' argument that the ongoing NPDES permit violations in late 2018 and through 2019, after U.S. Steel's voluntary implementation of the plans, shows the plans and the decree are inadequate. (DE 50 at 8–10; DE 52 at 2–7.) There are three reasons why the Court finds that argument is flawed.

First, it is unreasonable to fully judge the plans and the decree based on only voluntary compliance. As the Government Plaintiffs noted in their reply, the decree has only been implemented on a voluntary basis, which prevents any truly effective enforcement of its provisions. (DE 65 at 3.) If the decree had been entered at the time U.S. Steel committed the violations in late 2018 and throughout 2019, U.S. Steel would have faced stipulated penalties for each violation and for each day a violation occurred. The company did not have those repercussions to worry about or the knowledge that the decree was actually entered at the time of the violations. Thus, the provisions in the decree were inherently constrained from achieving their full potential.

Second, pre-judging based on the 2018 and 2019 violations fails to account for the degree of change that had to occur at the Facility to ensure it was brought into line with its permit requirements. Surfrider's own expert, Dr. Ranajit Sahu, concluded in his affidavit that "U.S. Steel appears to have had no preventative maintenance system in place *at all*," before the 2017 spill, was "not recording its maintenance activities," and had ample evidence of poor equipment

conditions. (DE 50-1 at 4–5) (emphasis in original). He concluded that "U.S Steel's Midwest Plant lagged far behind the current industry standard for maintenance and environmental compliance programs." (DE 50-1 ¶ 9.) The plans and other provisions in the revised decree address each of those key flaws. And while it would have been ideal for the Facility to voluntarily begin complying with the decree and immediately bring what had been a deeply flawed system into compliance, it is unsurprising given how far behind U.S. Steel was that there were ongoing violations as the Facility was first starting to implement changes. Further, the decree was not designed as a quick fix but instead is meant to create an iterative process where U.S. Steel will have to periodically review components of its plans to ensure it addresses any ongoing problems and continues to assure compliance. (DE 46-1 at 18; DE 65 at 3.) In that sense, the decree becomes even more effective as time goes on.

And third, Surfrider's argument does not properly account for the improvements in frequency and types of violations that occurred. While the Court recognizes that any permit violation is discouraged, it notes that U.S. Steel appeared to quickly work to resolve many of the violations throughout 2018 and 2019 and that the violations were often much less severe than the pre-enforcement violations. (DE 52 at 3–4; DE 64 at 4–11.) Of particular note is U.S. Steel's hexavalent chromium violation from October 2019, which while admittedly concerning given the Facility's history, was in a vastly lower amount than the April 2017 exceedance, had a human error cause that was readily identified and addressed, and exhibited U.S. Steel's ability to make timely, proper notifications to stakeholders in the region as it was required to do under the decree and which it had previously struggled with in May 2019. (DE 50-1 at 123–24, 129.) Further, the overall number of effluent exceedances at the Facility dropped significantly after U.S. Steel began negotiating and voluntarily complying with the consent decree, dropping from thirteen

instances in 2017 to four between January 2018 and December 2019. (DE 65 at 6.) Additionally, the Government Plaintiffs were well aware of these subsequent violations but still moved forward with this motion believing that the decree is reasonable and adequate. The Court thus finds it would be unreasonable to discount the technical requirements and decree because of the late 2018 and 2019 violations.

The Court also has considered the intervenors' experts opinions about the adequacy of the technical provisions but does not find the problems they believe exist warrant finding the decree inadequate. The City's expert premises her opposition almost entirely on the inadequacy of the technical requirements in light of the violations over the course of 2019. (DE 52-2.) For the reasons just explained, the Court does not view the 2019 violations as an indication that the technical requirements are inadequate or unreasonable.

Surfrider's expert, Dr. Sahu, while offering a more extensive view of why he believes the revised decree is still flawed, also does not convince the Court that the decree's technical provisions are inadequate and unreasonable. Dr. Sahu opined that the decree was too focused on the 2017 spill and left out certain things like detailed flow numbers, the current condition of U.S. Steel's equipment, and a sufficiently independent analysis by government experts of U.S. Steel's internal information. (DE 50 at 7.)

Initially, the Court finds the Government Plaintiffs satisfactorily addressed several of Dr. Sahu's concerns, including that the decree focused too narrowly on the April 2017 spill and that the decree doesn't address the root causes of the Facility's problems in their revisions to the initial iteration of the decree and in their thorough responses to comments. (DE 46-2; DE 65 at 10–11.) The Court also does not find the record supports Dr. Sahu's allegation that the government experts have not properly analyzed U.S. Steel's internal information given the

31

extensive evidence of regulator review of U.S. Steel's practices and procedures while negotiating this decree. (DE 47-1 at 4–5; DE 47-2 at 10–107.)

Additionally, Dr. Sahu's specific recommendations for needed improvement, while they may add to the decree, do not suggest to the Court that it is deficient in its current form. Government experts, who were far more involved in the investigation of the Facility's violations than Dr. Sahu, opined that the new plans and standard operating procedures at the Facility give Facility operators "more than enough information and guidance" to allow U.S. Steel to comply with its permit and have "adequately addressed the root causes" of the violations. (DE 47-2 at 6, 8; DE 47-3 at 4.) To the extent U.S. Steel or the government regulators believe more peripheral improvements, like Dr. Sahu's suggestions of more detailed flow numbers or a list of the current condition of each piece of Facility equipment, are needed as the decree plays out, the decree makes room for those improvements to be discussed as part of the ongoing obligation by U.S. Steel to periodically communicate with the government regulators about progress and places for improvement. (DE 46-1 at 28–31; DE 65 at 3.)

Considering all the technical requirements in the decree, as well as the expert's opinions and the facts of this case, the Court concludes the decree is both well-tailored to address the Facility's history of violations and technically adequate to bring about compliance in the future. *See United States v. Metro. Water Reclamation Dist. of Greater Chicago*, 792 F.3d 821, 825 (7th Cir. 2015) (citing *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 759 (7th Cir. 2004)) (considering whether the consent decree is likely to bring about compliance with environmental regulations).

### 4. Consistency with applicable law

The Court also finds the decree is consistent with and furthers the goals of the statutes underlying this litigation. The statutes at issue here are the CWA, CERCLA, SURPA, the EPCRA, and Title 13 of Indiana Code, which deals with state environmental regulations. (DE 1.) The purpose of the CWA is to restore and maintain the integrity of United States waters, including by preventing toxic discharges of pollutants and protecting wildlife and recreation. The laws within Title 13 of Indiana Code have a similar goal of preserving, protecting, and enhancing the quality of the environment so that future generations can enjoy it. Ind. Code § 13-12-3-1. The revised decree furthers those goals by imposing detailed compliance plans and reporting requirements on U.S. Steel to prevent toxic emissions from the Facility and alert those within the Facility and in the surrounding region when there is a potential threat.

The goal of CERCLA is to preserve and protect the environment from the effects of hazardous substances that may be released and ensure those responsible for any releases bear responsibility. *Cannons*, 899 F.2d at 90–91. The revised decree does this not only for the reasons previously mentioned, but by requiring U.S. Steel to pay both the remediation costs the government agencies incurred and a civil penalty. (DE 46-1 at 31–36.)

SURPA's goal is to recover response costs and damages for harm to national parks, 54 U.S.C. § 100723, which the decree does by mandating U.S. Steel pay both response costs and damages based on what NPS experts found with respect to the damages caused by the Facility's permit violations, particularly in relation to the April 2017 spill. (*Id.* at 32–33; DE 47-4.)

Finally, EPCRA has as one of its purposes to ensure accurate, reliable information on the presence and release of toxic chemicals is compiled and made available at a reasonably localized level. *Citizens for a Better Environment v. Steel Co.*, 90 F.3d 1237, 1239 (7th Cir. 1996), *vacated on other grounds*, 523 U.S. 83 (1998). The revised decree does this through its notification

requirements, primarily contained in Appendix B. (DE 46-1 at 63–70.) The decree thus is consistent with applicable law. *See BP Exploration*, 167 F. Supp. 2d at 1049.

### 5. Public interest

The Court next analyzes whether the decree is in the public interest. At the outset, the Court notes that the public interest is particularly high in this case given the Facility's proximity to Indiana Dunes National Park. *See Akron*, 794 F. Supp. 2d at 792 (finding that there was an especially high public interest because of presence of Cuyahoga National Park). The presence of other public beaches and water intake facilities for communities near the Facility adds to the high public interest here. But the decree and its requirements adequately account for this high public interest and importantly address the special consideration of a national park in such close proximity to the Facility.

First, the decree imposes a thorough system of compliance measures on the Facility that addresses the root causes of the violations that had potentially harmful impacts on the national park and surrounding area. Those measures, as discussed above, are designed to bring the Facility into compliance with environmental requirements specifically tailored to the Facility's location in the region by ensuring that it is properly maintaining its equipment and is operating with personnel who are trained in now extensive and detailed standard operating procedures. The reporting requirements, including semi-annual reports to regulators on the Facility's progress in abiding by the decree (DE 46-1 at 20, 22, 28–31), as well as the regulators' reserved right within the decree to enter the Facility at any reasonable time to collect information and decide for themselves if U.S. Steel is properly complying with the terms and goals of the decree, are key components of those compliance measures. (*Id.* at 45.) The major reformation the decree

represents inherently helps the surrounding area as it greatly eliminates the risk for dangerous water pollution outside the bounds of what the Facility's NPDES permit allows.

Second, the decree includes extensive requirements for public notification in the event of a violation. And these notification requirements were heavily fleshed out to specifically respond to and incorporate concerns contained in the public comments the Government Plaintiffs received. (DE 2-1 at 56–59; DE 46-2 at 63–70.)  Appendix B of the decree, the section containing the notification requirements, not only instructs U.S. Steel about the specific information it must gather should a violation occur, (DE 46-1 at 63), but also includes a full list of parties to be notified as well as descriptions of how those parties should be notified, why they should be notified, and what personnel within the Facility have certain notification responsibilities (*Id.* at 64–66). The section additionally clearly spells out U.S. Steel's responsibilities in the event of a wide variety of different violations that could potentially occur.

Surfrider was still unhappy with the revised Appendix B, but the Court does not agree with Surfrider that the requirements fail to protect the public interest. Surfrider argued that the changes the Government Plaintiffs made to Appendix B still failed to provide a way to directly notify individual members of the public who may be interested in notification. (DE 50 at 25.) But the Government Plaintiffs addressed this concern in their response to comments, concluding that such a notification requirement, while beneficial, was not necessary because there was no feasible way to notify every member of the public immediately as Surfrider seemed to be seeking. (DE 47-1 at 32.) While the Court recognizes that immediate notification may be ideal, it agrees with the Government Plaintiffs that the current list of entities to be notified sufficiently accounts for the public interest and will allow members of the public with an interest in being notified to be notified quickly. Appendix B and its focus on keeping the public, including

national park officials, patrons, and users of nearby public beaches, informed helps satisfy the strong public interest in this case.

Third, the Government Plaintiffs included a new environmentally beneficial project within the revised decree that also furthers the public interest. The EBP would require U.S. Steel to perform water quality sampling at the shoreline of seven locations near the facility, including near the national park and surrounding communities. In that way, the EBP would give the public additional protection by alerting them to potentially harmful compounds and conditions in the water, whether caused by the Facility or not, should the testing discover them. (DE 46-1 at 21–23.) This project is special to the decree and the Government Plaintiffs expressed doubt that it could have achieved this relief through litigation. (DE 65 at 12.) Additionally, the Government Plaintiffs gave Surfrider an opportunity to negotiate several modifications to the EBP before putting it into the decree, which they did. But Surfrider still argued the final version of the EBP was lacking because, among other things, it is not being implemented by an independent research institution, does not have enough sampling locations, does not sample frequently enough, and does not include a wide enough variety of factors in testing. (DE 50 at 25–26; DE 50-5.) The Court appreciates Surfrider's concerns and has considered them, but ultimately finds that a project that will test at seven locations for eight potentially harmful conditions on a weekly basis during peak public use, and will then make that information publicly available, is squarely in the public interest. (DE 46-1 at 21–25.)

Finally, the Court specifically analyzes the impact on Indiana Dunes National Park as well as comments the Court received from the National Parks Conservation Association in an amicus brief. The NPCA's brief, which echoed and added to the concerns expressed from other public commenters and the intervenors about the national park, opposed entry of the revised,

arguing: 1) the decree does not account for the heightened public interest in protecting the park; 2) the decree does not recover adequate past or future damages to the park; and 3) the proposed civil penalty is too small to serve a deterrent purpose. (DE 80 at 4–10.)

The Court finds the NPCA's first argument unavailing given the host of technical requirements, notification requirements, sampling requirements, and monetary penalties, all of which account for the heightened public interest given the proximity of a national park. It is also clear that the Government Plaintiffs carefully considered the national park in negotiating the decree given their reliance on expert reports that spoke specifically to the effect of the Facility's violations on the national park. (DE 47-4.) Finally, the Court notes that the NPS, which is charged with overseeing and protecting the country's national parks, not only played a central part in this case but has given its approval to the decree as one of the Government Plaintiffs. The Court thus finds the heightened interest in the proximity of a national park well represented in the decree.

The NPCA's second argument essentially suggests that the Government Plaintiffs got it wrong when they determined that the only damage to the Park from the five years of violations was the costs associated with the April 2017 spill. (DE 80 at 7–8.) But the NPCA only theorizes that there was additional damage, it has offered no proof that was the case. The Government Plaintiffs, on the other hand, provided the Court with an NPS expert opinion that detailed why the Government Plaintiffs sought only to recover the response costs and damages associated with the April 2017 spill. That opinion noted that other than the beach closures associated with the April 2017 spill, there was no evidence of damage outside of what could have occurred from the releases allowed under the Facility's NPDES permit over the preceding five years. (DE 47-4 at 3–4.) Finally, to the extent the NPCA and other non-parties to the decree are concerned about

future violations, the decree includes stipulated penalties for future violations and does not prevent regulators from pursuing new enforcement actions should new violations occur.

And as for the NPCA's third argument, the Court does not give it great weight for the same reasons it found the civil penalty substantively fair and the decree's provisions technically adequate earlier in this opinion. (DE 50 at 20–22; DE 52 at 8–9.) While it is true that there were violations at the Facility after U.S. Steel was made aware of the amount of the civil penalty, the process of reforming the Facility was still within its early months at that time and it would be unreasonable to expect immediate and total compliance that quickly. Further, the number and severity of violations decreased after U.S. Steel was made aware of the civil penalty, which suggests that the penalty did serve as a deterrent. The Court thus concludes the civil penalty, as well as the rest of the decree, is reasonable and adequate in light of the public interest in this case.

### 6. Relative strength or weaknesses of Government's case

The final reasonableness factor largely mirrors the Court's analysis of the first factor within the substantive fairness portion of this opinion. There is no doubt that the Government Plaintiffs have a strong case here given U.S. Steel's admissions to many of the violations, but the decree reasonably reflects that strong position. The Government Plaintiffs were able to negotiate a decree with U.S. Steel that reformed the central functioning processes of the Facility itself and imposed a host of new requirements at multiple levels of the Facility's day-to-day operations, including personnel management, daily chromium sampling, equipment upkeep, reporting requirements, and longer-term areas of improvement for continued compliance. In addition to the imposition of those technical requirements, the Government Plaintiffs also had U.S. Steel agree to a substantial civil penalty, a costly environmentally beneficial project, stipulated penalties, and

ongoing periodic reporting requirements. (DE 46-1 at 15–21, 28–31, 36–40.) Finally, the decree's termination standards, including the two years of full compliance and need to include the core requirements in the Facility's NPDES permit, ensures the revised decree will still be highly effective even after it is technically no longer in force. The Court considers those provisions and agreements to be reasonable and adequate given the relative strength of the Government Plaintiffs' case against U.S. Steel.

In coming to this conclusion, and the overall conclusion that the decree is fair and reasonable, the Court again notes that the Government Plaintiffs may have been able to impose more requirements or force higher payments if they had fully litigated this case. But that is not what happened, and it is not the Court's role to decide this case as if it had or to substitute its judgment for that of the parties bound by the decree. *EEOC*, 768 F.2d at 889; *BP Exploration*, 167 F. Supp. 2d at 1050. Both the Government Plaintiffs and U.S. Steel decided to negotiate in good faith toward a settlement in the form of the revised decree now before the Court. "The essence of settlement is compromise" and that is what the Court finds occurred here. *See EEOC*, 768 F.2d at 889. The Government Plaintiffs, with extensive public feedback, created and got U.S. Steel to agree to a consent decree that addresses the root causes of the violations listed in the complaint and has already led the Facility back toward compliance with its NPDES permit even without being fully enforceable. The Court thus finds, given its individual evaluation of the extensive record and the strong policy in approving a consent decree negotiated by federal regulators with expertise in the environmental field, that the consent decree is reasonable, adequate, and consist with applicable law.

## IV.    Conclusion

For the foregoing reasons, the Court DENIES the Surfrider Foundation's and the City of Chicago's motion for an evidentiary hearing or oral argument (DE 90; DE 94) and GRANTS the United States of America's motion to enter the revised consent decree (DE 46). The Clerk is ORDERED to enter judgment in accordance with the terms of the revised consent decree.

SO ORDERED.

ENTERED: August 30, 2021

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court