UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

UNITED STATES OF AMERICA, et al.,

     Plaintiffs,

     v.                           Case No. 2:18-CV-127 JD

UNITED STATES STEEL
CORPORATION,

     Defendant.

**OPINION AND ORDER**

Now before the Court is the motion of the Intervenor-Plaintiffs, Surfrider Foundation,

and City of Chicago (collectively "Intervenors"), for attorney's fees and costs pursuant to the fee

shifting provisions of the Clean Water Act (DE 123).[1] 33 U.S.C. § 1365(d). U.S. Steel has

responded to this motion and also filed a motion to bifurcate the fees proceedings to allow for

limited discovery. (DE 126.) The motion for fees will be granted as modified in this order. The

motion to bifurcate proceedings will be denied.

**A. Background**

The story of this case begins in 2017 at U.S. Steel's Midwest Plant in Portage, Indiana. In

April of that year, the plant released a dangerous amount of hexavalent chromium into Lake

Michigan. This environmental incident resulted in a series of lawsuits against U.S. Steel,

---

[1] While this case closed following the entry of the consent decree (DE 105), the Court finds that the Intervenors' motion for fees is best addressed here and not in their related, independent, lawsuit brought under the "citizen suit" provisions of the Clean Water Act. (That independent suit is *Surfrider Found. and City of Chicago v. United States Steel Corp.*, 2:18-cv-20 consolidated with 2:18-cv-33 (N.D. Ind.) ("Citizen Suit")). This order in no way disturbs the previously entered consent decree or otherwise affects the rights or obligations of any party not specifically discussed in this order. While this matter was previously closed, it has been reopened for the limited purpose of adjudicating the Intervenors request for attorney's fees by prior order of this Court. (DE 119, 122.)

including one brought against U.S. Steel by the Intervenors under the "citizen suit" provisions of the Clean Water Act ("CWA" or "the Act"). *Surfrider Foundation v. United States Steel Corp.*, 2:18-CV-20 (N.D. Ind.). The full details of the environmental incident and the course of litigation which followed are summarized by this Court's prior decision entering the consent decree. (DE 105.)

The short version of the story is that after the 2017 incident at the Midwest Plant, the instant plaintiffs, The Intervenors, each filed suits against U.S. Steel in January 2018 for violating the Clean Water Act pursuant to the Act's "citizen suit" provisions ("The Citizen Suit").[2] 33 U.S.C. § 1365(a)(1). The United States and the State of Indiana (collectively "the Governments") filed their own case against U.S. Steel in April 2018, pursuant to the government enforcement provisions of the Clean Water Act which is the instant matter ("The Enforcement Case"). 33 U.S.C. § 1319. Surfrider, Chicago, and U.S. Steel then jointly moved to stay the Citizen Suit while this case proceeded. Surfrider and Chicago later joined this case as intervenor-plaintiffs as authorized by statute. *See* 33 U.S.C. § 1365(b)(1)(B) (allowing intervention in enforcement proceedings by citizens as a matter of right). This case ultimately concluded with a Revised Consent Decree which the Court entered on September 2, 2021, over the objection of the Intervenors. (DE 105.)

After this case concluded, U.S. Steel moved, in the Citizen Suit, to lift the stay so it could move to dismiss. The Intervenors, unsatisfied with the conclusion of this case, also moved to lift that stay so they could file an amended complaint and continue their litigation against U.S. Steel.

---

[2] Surfrider and Chicago each filed an independent suit, and their suits were later consolidated into one action. 2:18-CV-20 (Surfrider's suit), 2:18-CV-33 (City's suit). The City of Chicago is represented by the municipality's Law Department, and Surfrider is represented by the Abrams Environmental Law Clinic at the University of Chicago Law School.

The Court resolved the motion for U.S. Steel and granted the motion to dismiss, dismissing most of the claims with prejudice on the basis of *res judicata* and closing the Citizen Suit case, while allowing the City of Chicago to separately refile their negligence claim. *Surfrider Foundation v. United States Steel Corp.*, 2:18-CV-20, 2022 WL 4448302 (N.D. Ind. Sept. 22, 2022).

As part of their opposition to the motion to dismiss in the Citizen Suit, the Intervenors asked, in the alternative, for the Court to declare them prevailing parties so they could seek attorney's fees and costs pursuant to the fee shifting provisions of the Clean Water Act. The Court declined this request in a footnote. In doing so the Court noted that none of the caselaw cited by the Intervenors suggested that they would be entitled to recoup fees in their Citizen Suit based on alleged success as intervenor-plaintiffs in a different suit. *Id.* at *9 n.5. At the same time, the Court reserved deciding whether the Intervenors could be considered prevailing plaintiffs entitled to fees in this suit. *Id.* It is also important to remember, as crucial context for that footnote, the Citizen Suit had been stayed for several years while the active litigation by the Intervenors took place in this case.

Further, it should be noted that the Intervenors sought to consolidate the Citizen Suit with this action, but that motion was denied for reasons unrelated to the merits by Magistrate Judge Rodovich. (2:18-CV-20, DE 37 (N.D. Ind. June 28, 2019).) Judge Rodovich also assured the Intervenors that their rights as litigants in the Citizen Suit would be protected by their status as Intervenors in this case. (2:18-CV-20, DE 37 at 9 ("The [Intervenor] plaintiffs will not be prejudiced [by the denial of consolidation] because their rights are protected through their intervenor status.")

**B. Discussion**

3

In deciding this motion the Court has four questions to address. First, whether the Intervenors are eligible to seek fees in this action pursuant to the Clean Water Act. Second, if the Intervenors are eligible under the statute, whether they can be considered prevailing or substantially prevailing parties entitled to fees. Third, if they are entitled to fees whether the amount of fees they have requested, some $1.6 million, is reasonable. Fourth, whether U.S. Steel's request to bifurcate proceedings and engage in limited discovery to determine the appropriate amount of fees is well taken.

### *(1) The Intervenors are eligible to seek attorney's fees*

The first question for the Court to decide is whether the Intervenors are eligible to even request fees in this action.

Under what is known as the "American Rule," prevailing litigants are generally not entitled to collect reasonable attorney fees from the losing party. In other words, each litigant pays her own attorney's fees, win or lose, unless a statute or contract provides otherwise. *Peter v. Nantkwest, Inc.*, 140 S.Ct. 365, 370 (2019). The Clean Water Act is one of those statutory exceptions to the American Rule. Specifically, the citizen suit provision of the Clean Water Act authorizes a court to award the "costs of litigation (including reasonable attorney … fees) to any prevailing or substantially prevailing party." 33 U.S.C. § 1365(d).[3] It is also worth noting that this section also creates the ability of citizens to intervene "as a matter of right" in an enforcement action brought by the United States or a State. 33 U.S.C. § 1365(b)(1)(B).

---

[3] This language resembles other federal statutory fee shifting statutes (*see e.g.* 42 U.S.C. § 1988, 200e–5(k), 7604(d)) and case law construing what is a "reasonable" fee applies uniformly to all of them. *Independent Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 758, n. 2 (1989).

Caselaw from other circuits endorses the proposition that individuals who (1) file a citizen suit under the CWA, then (2) become intervenors in a subsequent government enforcement action, and then (3) have the citizen suit and government suit consolidated, are eligible to pursue attorney's fees under the fee shifting provisions. *See Sierra Club v. Hamilton Cty. Bd.*, 504 F.3d 634, 639 (6th Cir. 2007); *Ne. Iowa Citizens for Clean Water v. Agriprocessors, Inc.*, 489 F. Supp. 2d 881, 886–887 (N.D. Iowa 2007).

U.S. Steel argues there are three reasons why the Intervenors are ineligible to seek fees. First, that the Court has allegedly already concluded the Intervenors are not prevailing parties. Second, that the statute does not allow the Intervenors, as intervenor-plaintiffs to a government enforcement action, to seek attorney's fees. Rather, it is restricted to awarding fees to citizen suit plaintiffs in their citizen suit. Third, to the extent *Sierra Club* supports the Intervenor's position, the majority decision in that case is wrong and the dissent presented a better argument which would be adopted by the Seventh Circuit if it had to decide the issue.

Turning to their first contention, U.S. Steel argues that this Court has already decided the issue of whether the Intervenors are prevailing parties in the footnote declining to award fees in the order dismissing the Citizen Suit. That footnote in its entirety reads as follows:

> "Plaintiffs also requested that if the Court found the Consent Decree meets the *FMR I* standard, that they be declared prevailing parties entitled to fee recovery per 33 U.S.C. § 1365(d). *The Court denies this request as the Plaintiffs, in having a motion to dismiss granted against them, cannot be considered prevailing parties in this case.* The Court notes that none of the case law cited by Plaintiffs remotely suggests they would be entitled to fees in this case, based on the alleged success of obtaining a Consent Decree in a different case where they are Intervenor-Plaintiffs. The Court does not take a position on whether the Plaintiffs would be considered prevailing parties as Intervenor-Plaintiffs in the Enforcement Case."

2022 WL 4448302, at *9 n.5 (internal docket citations omitted, emphasis added).

U.S. Steel argues this is a dispositive resolution of the Intervenors' attorney fees claim. U.S. Steel is incorrect, and their argument misses the forest for the trees. The context of the Court's footnote is key here. The Intervenors asked for attorney fees in the Citizen Suit in their response to the motion to dismiss after the stay was lifted. They stated their basis for being considered a prevailing party was the work they performed as intervenor-plaintiffs in the Enforcement Case while the Citizen Suit was stayed. While there were two separate cases pending, the Citizen Suit and the Enforcement Case, they involved the same nucleus of operative facts, largely the same parties, and were functionally consolidated.

The Court did deny the Intervenors request for fees in the Citizen Suit, but did not advance to an analysis of the request on the merits. Rather, the Court decided the much more limited issue of whether, based on the instant briefing, the Intervenors request for fees should be evaluated in that case.  The Court also reserved deciding the question of the merits in the Enforcement Case, where the litigation by the Intervenors had actually occurred. The Court's prior language emphasizing that the Intervenors' caselaw suggested they were entitled to fees in Case A, when all the work occurred in Case B, should dispel any doubt about the purpose of this footnote. That purpose was to serve a case management role and direct the Intervenors to pursue their request for attorney's fees in the case where the litigation had occurred, and where the record was developed, instead of the case which had been stayed for four years and had a minimal record. Consequently, the Court will reject U.S. Steel's first argument.[4]

---

[4] Further, in light of the functional consolidation of these cases the Court will consider Intervenors' request for fees as a result of work in the Citizen Suit with this request. U.S. Steel is incorrect that the Court's order in the Citizen Suit was a dispositive conclusion that the Intervenors are not entitled to recover fees for any work performed in bringing that suit. (*See* 127 at 13.) Again, context is key. While the majority of litigation activity occurred in the Enforcement Case, the Intervenors' overall contribution to the resolution of this case began with their filing of the Citizen Suit. In the interest of judicial economy the Court will consider the Intervenor's request for fees during both parts of this parallel litigation in one order. The Court will address the merit of the fees request based on the work performed and relative success in the Citizen Suit litigation efforts later in this order.

U.S. Steel's second argument is that the plain text of the Clean Water Act's fee shifting provision does not apply to intervenor-plaintiffs, rather it only applies to citizen plaintiffs in the action which they filed under the CWA's citizen suit provision. Therefore, as U.S. Steel's reasoning goes, under this case's current procedural posture, the Intervenors cannot ask for fees in this action because the Intervenor's related Citizen Suit has been dismissed and the associated request for fees denied. The end result, according to U.S. Steel, is that the Intervenors are completely precluded from seeking fees as a result of this litigation.

The relevant portion of the statutory text reads as follows: "The court, in issuing any final order in any action *brought pursuant to this section*, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d) (emphasis added). U.S. Steel argues that by referring to "this section," the statute only authorizes fees to be issued to parties in the citizen suit initiated under § 1365, and that authorization does not follow the citizen plaintiffs if they intervene in a government enforcement action. It is also worth noting that § 1365, in addition to authorizing citizen suits by private individuals or groups, also preserves the ability of citizens to intervene "as a matter of right" in an enforcement action brought by the United States or a State. 33 U.S.C. § 1365(b)(1)(B).

U.S. Steel makes some reasonable arguments against the hypothetical of a statute which allowed fee recovery by citizens who *solely* intervene in a government enforcement action and that there might be negative policy outcomes from such an interpretation, such as a flood of interventions to seek fees. *See United States v. Maine Dep't of Transp.*, 980 F. Supp. 546, 548 (D. Me. 1997) (denying attorney's fees to a party who intervened in a CWA enforcement case,

*but did not file an intervenor complaint and had never filed a citizen suit*).[5] But their characterization is not a fully accurate description of how the fee-shifting statute operates. It is not sufficient to merely intervene in a CWA enforcement suit, nor merely to file a citizen suit, to become entitled to attorney's fees.

Rather, the intervening party must be considered a prevailing or substantially prevailing party. This has been described by the Supreme Court as a generous standard. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Generous is not to be mistaken for toothless. The Court will discuss the standard more thoroughly later in this order, but for now it is sufficient to say this standard requires the fee-seeker to show they actually participated in the litigation and won at least some of what they were seeking. It is not sufficient to merely have a pulse, the ability to file a notice of intervention, and a desire to extort a CWA violator. As a result, the Court is skeptical of U.S. Steel's envisaged flood of citizen intervenors storming through the courthouse doors if it were held that § 1365(d) allows for intervenors, who have taken several other steps, to potentially recover attorney's fees and costs.

The Court would also note the Seventh Circuit has recognized the policy merits of allowing intervenors to be eligible for attorney's fees under fee shifting provisions related to civil rights laws. *See King v. Ill. State Bd. of Elections*, 410 F.3d 404, 421 (7th Cir. 2005) (interpreting fee shifting provisions of 42 U.S.C. §§ 1973/(e) (now codified at 52 U.S.C. § 10310), 1988). In

---

[5] The Court would note that it finds the language of this decision to imply that if the intervenors had filed their own citizen suit, or filed an intervenor complaint in the government enforcement action, that would be sufficient to result in a different outcome. *Id.* at 550–551. ("Had Plaintiff–Intervenors believed that the government's actions were inadequate, they could have brought their own citizens' suit, or filed a complaint when they intervened in the United States' enforcement action. Plaintiff–Intervenors are not, however, entitled to recover attorneys' fees under subsection 1365(d) solely for aiding in the government's enforcement efforts. Without the need for citizen enforcement, Plaintiff–Intervenors' case for attorneys' fees and costs is significantly weakened.") The facts here, where the Intervenors both filed their own citizen suit and a complaint in the enforcement action when they intervened, are consequently rather distinct from *Maine Dep't of Transp.*

particular, allowing intervenors to be eligible for fees can promote judicial efficiency by encouraging interested parties to intervene in existing suits rather than waiting until the entry of judgment and collaterally attack remedial schemes. *Id.*

In any case, the question here is more nuanced than U.S. Steel makes it out to be. The question is whether attorney's fees are available for citizens who intervene in a government enforcement action, and after they have also previously filed their own citizen suit, but that citizen suit is never formally consolidated into the enforcement action.

In this case the Intervenors have completed the first two of those requirements, and sought the third as well but were denied. Importantly, the decision to deny consolidation by the Magistrate Judge which did not consider the attorney fee implications[6] but nonetheless held the Intervenors' rights would be protected by their intervenor-plaintiff status. (2:18-CV-20, DE 37.) The question for the Court is accordingly narrowed even further to: are citizen plaintiffs precluded from recovering attorneys' fees under the CWA when they file their own citizen suit and intervene in a subsequent government enforcement action, *but the two cases are never formally[7] consolidated through no fault of the citizen plaintiffs*?

The Court finds the answer to be no. There is nothing in the reasoning of our sister courts' decisions which requires formal consolidation as an essential step in preserving eligibility for attorney's fees. There are also prudential reasons, especially stark in light of the specific facts here, which weigh against the Court adopting such a requirement.

---

[6] As no party raised the issue.

[7] The Court uses the term "formal consolidation" to reflect the unique facts of this case where the parallel litigation of the Citizen Suit and Enforcement Case were de facto consolidated by the entry of a stay, pursuant to *joint motion of the parties*, in the Citizen Suit to allow the Enforcement Case, with the same facts, very similar legal claims (and almost the entirely same parties once the Intervenors joined) to run its course. (2:18-CV-20, DE 22 (joint motion to stay), DE 24 (order staying case).)

To begin, it helps to take a step back and consider the larger enforcement scheme which Congress created with the Clean Water Act. The Supreme Court and the Seventh Circuit have recognized that the intention of Congress was for the United States, or the several states, to be the primary enforcers of the Act. *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 757 (7th Cir. 2004) ("*FMR I*") (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987)). The citizen suit section of the Act, including the provision allowing for citizen intervention in government enforcement actions, is designed to supplement rather than supplant governmental action. *Gwaltney*, 484 U.S. at 60 (discussing citizen-initiated enforcement suits); *United States v. Metro. Water Rec. Dist. of Greater Chi.*, 792 F.3d 821, 825 (7th Cir. 2015) ("*hereinafter "MWRD"*) (describing intervenor plaintiffs as also supplementing governmental actions)).

At the same time, citizen led enforcement is key to the enforcement scheme. This is evidenced by Congress including the fee shifting provision to promote enforcement of the substantive components of the Act and to encourage the pursuit of legitimate claims which might otherwise go unaddressed. *Atl. States Legal Found., Inc. v. Universal Tool & Stamping Co.*, 798 F. Supp. 522, 524 (N.D. Ind. 1992) (collecting cases, including *see also Pennsylvania v. Delaware Valley Citizens Council for Clean Air*, 478 U.S. 546, 559–60 (1986) (noting the purpose of fee shifting provisions is to encourage enforcement of the law and pursuit of legitimate claims against violators)*)*.

The Court does not see any reason that in promoting furtherance of this end, encouraging enforcement of the Act, Congress would require the procedural step of formal consolidation in order for a party to access the enforcement incentive of attorney's fees. Rather, the main requirement seems to be that the citizen's actions throughout the litigation effectively

supplement state action in enforcing the Act by bringing their legitimate individual claims against violators. Requiring the citizen plaintiffs to initially file their own suit under § 1365(d) works toward that larger purpose by demanding they present their own claims against violators. Likewise, requiring the citizen plaintiffs to intervene in an enforcement action brought subsequent to their citizen suit ensures their efforts supplement the ongoing governmental efforts instead of supplanting them with parallel private litigation.

In fact, there is some risk that having formal consolidation be an essential requirement might frustrate the purpose of the statutory scheme. As noted above, the purpose of fee shifting is to promote enforcement of the substantive components of the Act. Consolidation has an altogether different purpose. The core inquiry of whether to consolidate is whether consolidation serves the interests of convenience and judicial economy. *Miller v. Wolpoff & Ambramson, LLP*, 1:06-CV-207, 2007 WL 2473431, at *2 (N.D. Ind. 2007) ("The primary purpose of consolidation is to promote convenience and judicial economy.") (internal citations omitted). Consequently, there are reasons for denying consolidation which are totally unrelated to the merit of an action and potential merit of a future attorney's fee request. The consolidation order in this case illustrates that point well. The Magistrate Judge, reasonably, confined his analysis to the interests of convenience and judicial economy in deciding to deny the Intervenor's motion for consolidation and did not speculate on a future fees question. (2:18-CV-20, DE 37 at 3–4.) It does not strike the Court as particularly sound reasoning to make eligibility for attorney's fees, in service of a specific statutory purpose, contingent on the resolution of an unrelated case management question.

The Court nonetheless appreciates that formal consolidation is desirable, and likely advisable, in such cases as it conveniently unifies the ongoing litigation onto one docket and

avoids the procedural hiccups involved in parallel litigation. With that being said, even if there are policy reasons as to why formal consolidation *should be* an essential requirement, there does not appear to currently be any legal authority holding that *it is* an essential requirement. This is consequential to this case because it makes the Intervenors' reliance on the pledge by the Magistrate Judge, that their rights would be protected by their intervenor status, eminently reasonable.[8] The Intervenors had no reason to be concerned about their ultimate ability to request fees because a federal Magistrate Judge told them their rights would be preserved and there was no legal authority clearly indicating error by the Judge in making that holding. It is undisputed that throughout this litigation the Intervenors have clearly communicated their ultimate desire to seek fees if able. Additionally, these cases were functionally consolidated through the entry of a jointly requested stay in the Citizen Suit so that the parties could focus on resolving their claims through the Enforcement Case. All of this suggests to the Court that, when a plaintiff has filed a citizen suit, intervened in the subsequent government enforcement action, and the two actions are de facto consolidated, there is no basis in the purpose of the statute for requiring formal consolidation of the cases in order for the citizen plaintiff to pursue attorney's fees.

As to U.S. Steel's third argument, the Court declines their invitation to adopt the dissent in *Sierra Club*. It is the Court's view that a contrary reading to the majority opinion would greatly frustrate the underlying purpose and seemingly foreclose citizen plaintiff fee recovery whenever the government brings a subsequent enforcement action. *See King*, 410 F.3d at 420–21 (7th Cir. 2005) (noting, in a civil rights action, that allowing intervenors to recover attorney's fees promotes judicial efficiency and vindication of their legal rights). The Court ultimately finds

---

[8] Until U.S. Steel's briefing on this motion in 2023, the Magistrate Judge's June 2019 holding was unquestioned by any party.

the majority of the panel and the position of other courts to address the question is more persuasive in light of the underlying purpose of this section.[9]

The final point on this question is that even if U.S. Steel were correct in its interpretation of the law, and that the Intervenors cannot recoup fees in *this case*, the remedy is not the denial of the request for fees with prejudice. Rather, the appropriate remedy would be for the Court to dismiss the request in this case and allow the Intervenors leave to refile their request in the Citizen Suit where they are statutorily eligible for fees and their prior request was denied on case management grounds. The Court would then undertake a thorough merits analysis of whether they can be considered prevailing or substantially prevailing parties and whether their requested fees are reasonable.

Consequently, the Court finds that the Intervenors are eligible to request fees pursuant to § 1365(d) for the reasons described above.

### *(2) The Intervenors are substantially prevailing parties entitled to fees*

Having settled that the Intervenors are eligible to seek attorney's fees under the Act, the next question to decide is whether they are "prevailing or substantially prevailing parties" entitled to such fees. The Court finds that they are.

As previously described, the CWA only allows district courts to award attorney's fees to "prevailing or substantially prevailing parties." 33 U.S.C. § 1365(d). The typical formulation of this standard is that the party seeking fees "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S.

---

[9] The Seventh Circuit precedent cited by U.S. Steel relating to the "catalyst rule" as support for the proposition the Seventh Circuit would side with the *Sierra Club* dissent is inapposite. *See, e.g., Walker v. Calumet City*, 565 F.3d 1031, 1033 (7th Cir. 2009). The Intervenors' theory of fee eligibility is not predicated on the catalyst theory, it is predicated on their litigation against U.S. Steel in the Citizen Suit and their contributions to the Revised Consent Decree as intervenor-plaintiffs.

424, 433 (1983) (internal quotation omitted). The success achieved must result in a "material alteration of the legal relationship of the parties." *Buckhannon v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001). That is to say, a material alteration of the legal relationship by modifying the defendant's behavior in a way that directly benefits the plaintiff. *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992). The Supreme Court has held this is a "generous formulation" which determines whether the movant is eligible for fees; but determining the reasonableness of the requested fees is a separate inquiry for the district court. *Hensley*, 461 U.S. at 433. This statutory threshold can be satisfied by obtaining a consent decree, as well as obtaining a favorable verdict or judgment. *Buckhannon*, 532 U.S. at 604.

This standard has been interpreted by sister courts to allow fee recovery by citizen plaintiffs who, after filing CWA citizen suits, made substantial improvements to a consent decree in subsequently filed government enforcement actions. *Sierra Club*, 504 F.3d at 638–39; *Agriprocessors*, 489 F. Supp. 2d at 893. This is because by making substantial improvements to the consent decree, the citizen-plaintiffs are materially altering their legal relationship with the defendant by modifying the defendant's behavior in a manner which benefits them. *Agriprocessors*, 489 F. Supp. 2d at 893 (citing *Sierra Club v. City of Little Rock*, 351 F.3d 840, 845 (8th Cir. 2003)). Further, a consent decree normally alters the legal relationship between the plaintiff and defendant because its entry will bar further litigation of the plaintiff's claims under the CWA. *Id.* Lastly, the presence of a citizen suit preceding government enforcement action is generally inferred as a motive for the polluter to settle the case and bring about the goals of the citizen suit. *Atl. States Legal Found. v. Eastman Kodak Co.*, 933 F.2d 124, 128 (2d Cir. 1991) (holding that, absent contrary evidence, one can infer the existence of a citizen suit was a motive

14

for a polluter's settlement with state authorities and thus the citizen suit plaintiff is a prevailing party).

One of our sister courts has also persuasively articulated that the policy goals of the Act, preventing water pollution, would be frustrated by categorically excluding citizen plaintiffs from attorney's fees eligibility when a case ends via consent decree between the polluter and a government enforcer. *Agriprocessors*, 489 F. Supp. 2d at 893–94. In such a world, there would be significantly weaker incentives for citizen suits to be filed because every citizen plaintiff runs the considerable risk the government will step into the case, reach an agreement with the polluter, and extinguish their claim to fee reimbursement. In effect the citizen plaintiffs would end up rooting for the government to be less active in CWA enforcement, so the citizen plaintiffs might shoulder the burden of litigation alone and retain their eligibility for fees. That is a bizarre outcome when the purpose of the citizen suit, and fee shifting, are to supplement, not supplant, government enforcement of the Act. *Gwaltney*, 484 U.S. at 60. Further, the Supreme Court has recognized that the citizen suit provision "evinces a Congressional intent to 'protect [] [citizen plaintiffs] from the suddenly repentant defendant ….'" *Agriprocessors*, 489 F. Supp. 2d at 894 (quoting *Gwaltney*, 484 at U.S. at 67 n.6).

As the final point on this threshold legal question, the fact the party opposed the proposed consent decree is not dispositive on the question of whether the party is prevailing or substantially prevailing. *See Sierra Club*, 504 F.3d at 639 (noting the intervenors opposed the initial consent decree and caused its withdrawal). The Court finds that the fact a party opposed a consent decree, but they now seek to recover fees from the entry of that decree, is better accounted for in determining the reasonableness of the fees. The question for the prevailing party inquiry is whether the party achieved "*some* of the benefit the parties sought in bringing suit."

*Hensley*, 461 U.S. at 433 (emphasis added). Again, this is a "generous formulation" which determines whether the movant is eligible for fees. *Hensley*, 461 U.S. at 433. This is a binary inquiry, either they are eligible, or they aren't. The more nuanced question of how successful (i.e., prevailing) a party is, is better addressed in assessing the reasonableness of fees where the size of the award can be adjusted to be commensurate with the party's relative success. *Hensley*, 461 U.S. at 436; *Spegon v. Cath. Bishop of Chicago*, 175 F.3d 544, 550–51 (7th Cir. 1999) (noting district courts have latitude to modify the "lodestar" amount of attorney's fees based on the "degree of success obtained").

> *(a) The Intervenors' contributions during the course of the litigation make them substantially prevailing parties*

Having settled that the Intervenors may be considered prevailing parties even if they are not signatories to the consent decree, the Court next must consider whether their activities in the course of this litigation and the resulting outcome make them substantially prevailing parties. The Court finds the answer is yes.

U.S. Steel characterizes the Intervenors as inconsequential litigants who at most impacted the proceedings through their comments submitted to the Government during the public comment period on the proposed consent decree. U.S. Steel consequently hangs their hat on the idea that parties who merely add public comments are not entitled to fees. This characterization of the Intervenors' role in this case is contrary to the record.

As an initial matter, the Intervenors were not merely members of the public who filed comments during the relevant opening. They were litigants against U.S. Steel, as plaintiffs in their Citizen Suit, and as intervenor-plaintiffs in the Enforcement Case. Further, the fact a party

utilized a public comment process as one avenue of advancing their client's position does not bar a request for attorney's fees. The Supreme Court has declined to limit recovery of attorney's fees to exclusively judicial proceeding related activities. *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 557–58 (1986) (declining to limit actions that support a fee request to exclusively court proceedings).

In this case, the Intervenors contributions can be grouped into two categories. First, how their litigation efforts strengthened the Government's legal and negotiating positions and second, the feedback the Intervenors provided on the proposed Consent Decree, through public comments and confidential feedback. As to the second effort, the Court finds it particularly consequential that the Intervenors were provided with access to confidential draft documents for feedback to the Governments and had an exclusive extension of the public comment window to provide their feedback. These are not conditions which are broadly afforded to members of the public who happen to have an interest in a particular piece of litigation.

First, the Court has previously recognized that the Intervenors litigation efforts strengthened the bargaining position of the Government in negotiating the consent decree. (DE 105 at 18.) The Intervenors did so by prompting admissions of violations by U.S. Steel in response to the Citizen Suit complaint, filed a month before the Enforcement Case complaint was filed, and the intervenor complaints filed in the Enforcement Case. *Id.* (citing to answers to the intervenor complaints at DEs 87, 88); *see also e.g.* 2:18-CV-33 DE 17 ¶¶ 78, 82, 85 (admissions in answer to Surfrider Citizen Suit complaint); DE 18 ¶¶ 72, 76, 79 (admissions in answer to City of Chicago Citizen Suit complaint).

Second, the Intervenors engaged in meaningful feedback on the proposed consent decree which they argue resulted in three substantive changes to the final decree. The Court agrees they

have shown responsibility for two of these changes. The first is the proposal and development of the Environmentally Beneficial Project ("EBP") provision. There was no EBP provision in the original consent decree and the Governments acknowledged in their filings that the EBP was implemented in response to a request by Surfrider and other public comments seeking such a project. (DE 65 at 12.) The Governments then shared a draft of the EBP proposal with Surfrider before lodging the revised consent decree for feedback. *Id.* The parties then negotiated several modifications to the draft based on Surfrider's recommendation but did not incorporate every change Surfrider requested. *Id.* Surfrider opposed the final proposed consent decree in part because they sought improvement of five EBP conditions. It is also notable that these negotiations took place after the public comment period had closed and the Governments submitted a draft of the EBP plan to the Intervenors under a confidentiality agreement. (DE 47-1 at 7.) The Intervenors then provided detailed comments on the proposed drafts which the Governments found helpful and discussed with U.S. Steel. (*Id.*)

The second set of changes are enhancements to the notification procedures in Appendix B of the consent decree. Before the proposed consent decree was lodged, the City of Chicago specifically requested that it be added to the list of parties to be notified in the event of a spill or release. (DE 47-1 at 5 n.6, 28.) The Intervenors also made this request during the course of the public comment period. Like the EBP draft, the Intervenors were given special access to the draft of Appendix B under a confidentiality agreement, the Intervenors made detailed comments which the Government found helpful, and the final Appendix B includes improvements made by the Intervenors. (DE 47-1 at 7.)

The third claimed change is a series of changes to the Operations and Maintenance Plan ("O&M Plan") and Wastewater Monitoring Design. These included making comments on the

Wastewater Monitoring Design during an extended public comment period only afforded to the Intervenors. (DE 47-1 at 6.) The Governments agreed with some of those designs, including that the design should include a detailed evaluation of the Facility's existing wastewater process monitoring with a schedule for completion of the improvements in existing wastewater process monitoring. (*Id.*) U.S. Steel agreed with this recommendation and made appropriate revisions to the final Design. (*Id.*)

The Court is less persuaded about the impact of the Intervenors' efforts on the O&M Plan given the nature of their briefing. In their initial brief, the Intervenors claim credit for a host of changes to the O&M Plan as a result of the public comments but do not adequately establish it was their comments that were responsible for suggesting such amendments. In particular, the Intervenors claim credit for requiring specific procedures for maintenance activities, equipment inspections, and reporting, are reflected in the Revised CD." (DE 123-1 (brief in support of motion) at 16 (citing to the Revised Consent Decree).)

The Court would note in general the Governments' filing detailing their responses to public comments identifies and specifically credits the Intervenors when they were uniquely responsible for an implemented suggestion or had special access to the revision process. (DE 47-1 at 5 n.6, 7, 28.) At other times it refers to changes made as a result of public comments generally. (*See e.g.*, DE 47-1 at 8–10.) From the Court's review of the responses, the Governments do not directly attribute any O&M improvements to the specific comments of the Intervenors. This does not shed much light on the Intervenor's specific contributions to the O&M Plan.

In an alternative attempt to determine the Intervenors' contribution to the O&M plan, the Court attempted to compare their public comments and the language ultimately adopted by the

consent decree. This turned out to be a futile errand. The Intervenors assert the O&M plan changes described in the Governments' response stem from their comments, but the evidentiary support they muster is a pin citation to the entire 141-page public comment for Surfrider (DE 47-5 at 105–246) and the entire 23-page public comment for the City of Chicago (DE 47-5 at 149–72). This is where the Court stopped its efforts on the Intervenors' behalf. As the Seventh Circuit has said on numerous occasions, "Judges are not like pigs, hunting for truffles buried in [the record]." *Gross v. Town of Cicero*, 619 F.3d 697, 702 (7th Cir. 2010) (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). If the Intervenors would like to be granted $1.6 million in attorney's fees, plus interest, for contributions they made to the Revised Consent Decree, it is manifestly their burden to show what their contributions were and not proffer vague references to their extensive public commentary.

This issue with establishing the Intervenors' contribution to the O&M plan is ultimately by the by. The Intervenors' other contributions through their litigation and litigation related activities are sufficient for them to qualify as substantially prevailing parties. The Intervenors helped bring about the consent decree by improving the negotiating position of the Governments in the Enforcement Case through inducing U.S. Steel to admit to violations in the answers to the Citizen Suit complaints and the intervenor-complaints in the Enforcement Case. Further, the Intervenors actions in providing public comments and confidential feedback during the negotiation of the consent decree resulted in improvements to the provisions regarding the EBP and Appendix B.

These contributions can be considered as obtaining at least some of the benefit the Intervenors sought in bringing suit. *Hensley*, 461 U.S. at 433. The benefit sought in the Citizen Suit, and intervention in the Enforcement Case, was to obtain relief for U.S. Steel's violations of

the Act and compel U.S. Steel to take measures which would prevent future violations. That

benefit was achieved by U.S. Steel agreeing to a consent decree which would remediate past

harms and reduce the likelihood of future violations of the Act. As such, the Court finds the

Intervenors to be substantially prevailing parties who are entitled to fees.

### (3) The amount of attorney's fees requested by the Intervenors will be modified by the Court

The Intervenors collectively seek $1,676,675.15 in attorney's fees and costs. This is

composed of $813,365.25 for Surfrider, with $791,820.75 for attorney work over the course of

2,315.60 hours, $20,974.50 in expert fees, and $570 for other expenses. For the City, it is a total

of $863,209.90, with $798,507.40 for attorney work over the course of 1,380.20 hours,

$63,302.50 in expert fees, and $400 in other expenses.

U.S. Steel objects to this amount as excessive. U.S. Steel's objection to this amount can

be grouped into two categories. First, several arguments take issue with the number of attorney

hours which the Intervenors submit. Second, they seek to reduce the award based on the

Intervenors limited degree of success. U.S. Steel does not object to the miscellaneous expenses,

the fees for the experts, or the billing rates proposed for the Intervenors' respective attorneys

based on their experience. As such, the Court will grant the undisputed fee requests, i.e., the

experts and "other expenses" (which are collectively $82,247), and accept the proposed hourly

rates offered by the Intervenors.

The Court independently finds the proposed hourly rates the Intervenors offered, listed in

Exhibit L (DE 123-2 at 187), are reasonable and reflect the rates charged by attorneys of similar

skill and experience in the relevant community. *Atl. States Legal Found.*, 798 F. Supp. at 526

(internal citations omitted). The Court concurs with the assessment of the several experienced litigators and environmental attorneys, proffered in declarations by the Intervenors, who indicate the proposed rates are reasonable. ((DE 123-1 (brief in support of motion) at 21–22 (summarizing declarant opinions).) Further, it was appropriate for the Intervenors to consider this proceeding to take place in the Chicago legal market given this litigation took place in the Chicago metropolitan area and in light of the legally and technically complex nature of the proceedings which required specialized knowledge that was unavailable within the District. The Court approves of the Intervenors use of the "Fitzpatrick Matrix" to ground their hourly rate calculation.[10] The hourly rates proposed by the Intervenors are well within the hourly rate equivalent of other awards this Court has approved. *See e.g., Long v. Saul*, 2021 WL 2588110, at *1 (N.D. Ind. June 24, 2021) (collecting cases) (approving an award of $1,711.96 per attorney hour).

The Court now turns to the contested portions of the fee request. In applying a fee shifting statute, after determining whether or not to award fees, the district court is to consider whether fees requested are reasonable. *Hensley*, 461 U.S. at 433. The starting point of the reasonability determination is the so called "lodestar" which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Id.* The party seeking an award is responsible for submitting evidence supporting the hours worked and rates claimed. *Id.* If the documentation is inadequate, the district court may reduce the award accordingly. Further, the district court should exclude hours that were not "reasonably expended" on the litigation. *Id.* at

---

[10] The Fitzpatrick Matrix is a chart prepared by the United States Attorney for the District of Columbia to guide what can be considered reasonable legal fees in complex matters. While the Matrix is not adopted for use by the Department of Justice outside the District of Columbia, other judges within this district have held it is a useful resource for determining whether fees are reasonable, particularly in "*similar situated metropolitan areas, such as the Chicago metropolitan area where this Court is located.*" *Mitchell by Mitchell v. LVNV Funding, LLC*, No. 2:12-CV-523, 2020 WL 1862192, *3 n.1 (N.D. Ind. Apr. 13, 2020) (emphasis added).

434. There are other factors which may also persuade a district court to adjust the award upward

or downward, including the important factor of "results obtained." *Id.* In regard to this last factor,

the Supreme Court has instructed lower courts to consider two questions: (1) did the plaintiff fail

to prevail on claims that were unrelated to the claims on which he succeeded, and (2) did the

plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis

for making a fee award? *Id.*

> *(a) The Court will reduce Intervenor's requested hours by ten percent based on their reliance on reconstructed time records*

The Court will first address U.S. Steel's argument that the Intervenors hours should be

significantly reduced as they are insufficiently documented and potentially duplicative. The

Intervenors admit they largely did not keep contemporaneous time records and their requested

hours rely upon reconstructions based on various records including a contemporaneous time log

by Attorney Weinstock, contemporaneous time logs of the student law clerks, calendar entries,

and email correspondence. Their explanation is that as a non-for-profit student law clinic and

municipal government department, their standard operating procedure does not involve billing

clients for work performed and thus they did not create contemporaneous records. U.S. Steel

cites several cases demonstrating a judicial preference for contemporaneous records to argue the

Intervenor's reconstruction is insufficient. Further, U.S. Steel claims it is "disingenuous" of the

Intervenors to invest thousands of hours into this case with the intention of seeking fees but also

declining to keep contemporaneous records.

U.S. Steel is largely incorrect about the need for contemporaneous timekeeping. It is

certainly better to rely upon contemporaneous records when possible. However, it is not

categorically forbidden to use reconstructed records in a request for fees. The Seventh Circuit has explicitly held there is no *per se* rule requiring the submission of contemporaneous time records in support of a request for attorney's fees. *Harper v. City of Chicago*, 223 F.3d 593, 605 (7th Cir. 2000). Further, a sister court recently rejected an argument along the lines of U.S. Steel's based on relatively recent Supreme Court precedent. *Bell v. Powell*, 2019 WL 3945511, at \*4 (S.D. Ind. Aug. 21, 2019) (rejecting the argument that fee shifting statutes require contemporaneous timekeeping and noting the Supreme Court expressly allows for estimates in calculating attorney time) (citing *Fox v. Vice*, 563 U.S. 826, 838 (2011)).[11] That said, the Seventh Circuit has advised district courts to consider reliance on reconstructed records and whether that merits a discretionary reduction of the request fee. *Harper*, 223 F.3d at 605. But the Court will come to that issue in good time.

The Court next considers U.S. Steel's argument that the records are unreliable because Intervenor's counsel utilized a contemporaneous record of Attorney Robert Weinstock, representing Surfrider, to help them in reconstructing their records. U.S. Steel takes issue with this on the basis that Attorney Weinstock never filed an affidavit about the accuracy of his records, rather his co-counsel, Mark Templeton, filed one on his behalf, and the underlying document, a spreadsheet prepared by Attorney Weinstock, was not submitted. U.S. Steel argues this calls the entire reconstructed record into doubt. The Court disagrees. Attorney Weinstock's personal records are but one source of information the Intervenor's counsel used to reconstruct their records. They also utilized contemporaneous records of student law clerks, referencing

---

[11] *Bell* also contains an excellent explanation of why U.S. Steel's case in support of its argument, *Cordell v. Colvin*, 2015 WL 4093344 (N.D. Ind. July 7, 2015), is best read as limited to the specific facts. Namely, *Cordell* dealt with an attorney who routinely provided a near identical estimation of his time in every case and defied repeated admonitions from the court to improve his timekeeping. *Bell*, 2019 WL 3945511, at \*5.

calendar entries, email correspondence, work product emails, and court filings. Again, there is no hard and fast rule that a request for attorney's fees must be grounded in contemporaneous records. So even if the Court were persuaded Attorney Weinstock's records were unreliable, it would not instantly doom the Intervenor's request.

In any case, the Court does not agree with the suspicion heaped upon Attorney Weinstock's records. The fact a co-counsel filed the declaration attesting to the accuracy of Attorney Weinstock's records is not inherently concerning, it is not unheard of for one attorney to file such an affidavit on behalf of co-counsel. *See e.g.*, *Knepp v.* Huffman, No. 3:17-CV-282, DE 47, 48 (N.D. Ind. Sept. 4, 2019) (awarding attorney's fees based on a single attorney's affidavit on behalf of all attorneys in the case). The case U.S. Steel cites allegedly taking issue with that practice is inapposite as it is factually distinct. *Lock Realty Corp. IX v. U.S. Health, LP*, No. 3:05-CV-715, 2015 WL 1402186, at *1 (N.D. Ind. Mar. 26, 2015). In *Lock Realty*, a single attorney submitted reconstructed time logs on behalf of his co-counsel. *Id.* The other attorneys submitted statements to the Court about their work on the case, but those statements did not attest that they had reviewed the reconstructed time logs prepared by the lead counsel, and that such reconstructions were accurate. *Id.* at *3. This left the court without any evidentiary basis to conclude the estimates were accurate for those attorneys.

The instant case is distinct from *Lock Realty* in several ways. First, Attorney Templeton's declaration indicates Attorney Weinstock communicated to him that he reviewed and confirmed the entries made by Attorney Templeton. (*See e.g.*, DE 123-2 at 7 (Exh. A) ¶ 24 ("Professor Weinstock reported to me that he engaged in the activities listed below to review and confirm his contemporaneous records.").) Second, Attorney Templeton indicated that he had personal knowledge of what actions other members of the litigation team took in this litigation. (*Id.* at 3–4

¶ 11 ("I [Attorney Templeton] participated closely in each step of Surfrider's representation … I therefore have direct personal knowledge of the individuals who have contributed to Surfrider's representation and the work that Surfrider's attorneys, student law clerks and expert performed at each stage of the U. S. Steel matter.").) Lastly, *Lock Realty* dealt with a subsequent fee request after the Court denied the initial request and instructed the petitioning party to exclude several categories of time which were inappropriate. 2015 WL 1402186, at *2.

Therefore, the failure to include Attorney Weinstock's records or a declaration from him independently confirming the accuracy of his time[12] is not fatal, especially given the various other sources the parties relied on in making the reconstruction. Nonetheless, it is concerning that the Intervenors omitted Attorney Weinstock's contemporaneous records. Neglecting to provide a useful piece of corroborative evidence detracts from the case for the reliability of their reconstructed records and will thus be reflected in the Court's downward adjustment for their reliance on reconstructed records.

Next the Court will consider U.S. Steel's arguments regarding potential duplicative work by Surfrider and the City. This argument largely amounts to speculation with no specific citations to the record. U.S. Steel offers three examples of potential duplication: alleged overlap in the parties' public comments, and duplicative language in the parties' respective citizen suit complaints which "recurs in multiple other filings in [the Enforcement] case and the citizen suit," and Attorney Burke's declaration stating both parties advocated for the EBP. (DE 127 at 23.) U.S. Steel alleges that the last point evidences a "copy-and-paste job by [the City]." (*Id.*)

---

[12] The Court would stress that Attorney Templeton, as an officer of the court, has represented he had Attorney Weinstock confirm the accuracy of his time logs. U.S. Steel has offered no evidence to suggest Attorney Templeton has acted with anything less than full candor toward the Court in making these representations.

As an initial matter, the Court finds this challenge to be underdeveloped. *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1062–63 (7th Cir. 2020) (Holding that arguments that are underdeveloped, cursory, and lack supporting authority are waived). U.S. Steel makes sweeping allegations and offers little specific evidence in support of their claims. U.S. Steel makes no citation to the record supporting its claim of alleged "overlap" in the public comments of Surfrider and the City. (DE 127 at 23.) As noted elsewhere in this order, the Intervenors submitted extensive public comments, 141 pages and 23 pages respectively. It is not the Court's job to flesh out U.S. Steel's accusations by comparing the two documents side by side, count the number of similarities, and then reason out whether it is a natural result of having similar litigation positions or "copy and pasting" work from the other party to try and double bill U.S. Steel. *Gross*, 619 F.3d 697, 702 (7th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in [the record]."). The appropriate course would have been for U.S. Steel to identify some specific examples in the response, giving the Intervenors a chance to explain any contested entries in their reply. This adversarial engagement would then let the Court consider if a genuine question of fact existed regarding the reliability or duplicative nature of any given time entry.

The accusation related to the complaints is similarly inadequate. U.S. Steel cites the record, but only to the docket entries for the entire complaint. A helpful citation for this argument would have been to point out a few specific passages in each complaint whose similarity U.S. Steel found suspicious in their response.[13] Again, this would have allowed some direct engagement by the Intervenors in their reply and give the Court a sense if the issue needed further exploration.

---

[13] The Court finds it puzzling that U.S. Steel seeks discovery and an evidentiary hearing to inject more evidence into the record, but has seemingly not effectively utilized the voluminous record they already have before them.

U.S. Steel's concern over the declaration of Attorney Fiona Burke, representing the City, that both Surfrider and the City advocated for the EBP, also seems overwrought. As an initial observation, it is not shocking that co-intervenors with similar interests sought and advocated for a common goal. Next, the comment itself hardly suggests impropriety. The relevant passage reads as follows:

> The City also made significant, direct contributions to the Revised Consent Decree itself, shaping the procedural and substantive components during the revision process. For example, the Environmentally Beneficial Project that *the City advocated for alongside Surfrider in its public comments* was eventually included in the Revised Consent Decree and required Defendant to monitor and report on water quality at multiple locations along Lake Michigan to provide the public with previously unavailable information about water quality.

(DE 123-3, Exh. R. ¶ 47.)

This is hardly a smoking gun. Maybe this could have served as the introduction to an argument about duplicative hours, segueing into discussion with record citations about how the public comments of both parties are virtually identical and the hours billed for the EBP commentary was likewise virtually identical. That would be evidence which could support an inference that one party did the work and the other copied but seeks compensation as if they drafted it themselves. That evidence and inference could then present a reasonable case for further inquiry or an adjustment to the requested fees. This is not the evidence which U.S. Steel has mustered, however.

Lastly, the Intervenors outlined several steps they took to conservatively estimate their hours and exclude potential duplicative entries. This includes the respective parties reviewing

their own time logs, comparing it to their co-intervenor, and if it was significantly more than the co-intervenor they would eliminate or reduce entries for work which appeared redundant or inefficient, such as multiple attorneys working on the same task or duplicative work of student law clerks. (DE 123-3 (Exh. R) ¶ 47 (Attorney Burke declaration for City); DE 123-2 (Exh. A) ¶ 33 (Attorney Templeton declaration for Surfrider).) U.S. Steel says nothing about these efforts in their briefing. This is the coup de grace against their argument. U.S. Steel's generic handwringing about potentially duplicative hours is significantly less credible when they have not discussed the preventive measures taken by opposing counsel to avoid such billing and explained why the measures were inadequate.

Ultimately, while U.S. Steel's general opposition to the use of reconstructed records is not well taken, the Court agrees that contemporaneously prepared records are preferable and that the risk of inaccuracies in reconstructed records should fall on the party relying on them. The Court finds that a case offered by the Intervenors, *Harper v. City of Chicago Heights*, present an appropriate solution. No. 87 C 5112, 2002 WL 31010819 (N.D. Ill. Sept. 6, 2002) (Hereinafter "*Harper II*"). In *Harper*, the defendant park district argued the attorney's fees petition was not properly documented because it was predominantly composed of reconstructed, instead of contemporaneous, time records. *Id.* at *3. Our sister court found that approach was too sweeping, but nonetheless reduced the plaintiff's total number of compensable hours by ten percent because "the movant bears the risk that the reconstruction may contain errors due to faulty memory and improper estimates." *Id.*

The Court views that as an appropriate measure here as well. The court understands that as a non-profit law clinic and municipal government department, the Abrams Clinic, and the City of Chicago, respectively, do not bill their clients for legal services rendered. Nor is it

disingenuous for such entities to stick to that standard operating procedure even if they are undertaking litigation where they will ultimately seek an award of attorney's fees.[14] Nonetheless, they cannot eat their cake and have it too. If the Intervenors choose to engage in litigation planning to pursue attorney's fees but consciously opt against contemporaneous time keeping in favor of reconstructed time logs, they will have to bear the risk of any error in their reconstruction. In *Harper II* the adjustment was a ten percent reduction. Accordingly, the Court will reduce the Intervenors' total number of compensable hours by ten percent to reflect the potential errors in relying principally on reconstructed records. The Court will utilize an average hourly rate to calculate the total cost of that reduction.[15] Ten percent of Surfrider's requested hours amounts to 231.56 hours, multiplied by the average hourly rate of $341.95, resulting in a downward adjustment of $79,181.94. For the City, ten percent of their hours is 138.02 hours, multiplied by an hourly rate of $578.54, resulting in a downward adjustment of $79,850.09.

> (b) The Court will adjust the requested fee due to the Intervenors' relative lack of success

Turning to the next objection by U.S. Steel, the Court agrees that the Intervenors' request needs to be trimmed to reflect their degree of success here. The Intervenors argue there should be no such deduction, but that defies common sense. Prior to the fee proceedings the Intervenors

---

[14] It is appropriate to vigorously advocate for one's client and vigorously scrutinize an opponent's case. It is altogether a different matter to accuse opposing counsel of dishonesty without any basis. There is nothing sinister in the Intervenor's choice, given their organizational structure and purpose, to opt against utilizing billable hour record keeping when they are not required to. As noted above. they will have to accept the downsides of that choice when it relates to recovery of attorney's fees, but those downsides should not include being subjected to insinuations about their integrity.

[15] For Surfrider that rate is $341.95 per hour given they sought $791,820.75 in compensation for 2,315.60 hours. For the City of Chicago that rate is $578.54 per hour given they sought $798,507.40 in compensation for 1,380.20 hours. The Court utilizes this averaged rate to reflect this adjustment falls evenly across the various attorneys.

have made it abundantly clear they do not view this litigation as an entirely successful resolution. They vigorously opposed the consent decree which concluded this case (DE 50, 51), and sought to lift the stay in their Citizen Suit to continue litigating against U.S. Steel and obtain relief for issues which they believe remained unresolved. (2:18-CV-20 DE 50.) The Intervenors need not be one hundred percent successful in their litigation to obtain *any* attorney's fees, but they are not entitled to one hundred percent of their attorney's fees when by their own standard they are not fully successful.

In determining the adjustment to be made to a fee award based on the level of success, the Supreme Court has instructed lower courts to consider two questions: (1) did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded, and (2) did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award? *Hensley*, 461 U.S. at 434. When a plaintiff has obtained excellent results, her attorney should recover a fully compensatory fee and the award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. *Id.* at 435 (internal citation omitted). If, on the other hand, there has only been partial or limited success, the product of hours reasonably expended on the litigation as a whole, multiplied by a reasonable hourly rate, might be excessive. *Id.* at 436. The district court has discretion in making this equitable judgment, including whether to make an adjustment as a number of hours which should be eliminated or simply reduce the award to account for the limited success. *Id.*

In initiating their Citizen Suit, and through the course of the following litigation which included intervention in this case, the Intervenors were pursuing the goals of (A) holding U.S. Steel accountable for its violations of the Act and (B) compelling the implementation of measures to prevent future violations. (*See e.g.*, 2:18-CV-20 DE 1 at 36–37 (Surfrider complaint

in Citizen Suit); DE 85 at 32–33; DE 86 at 26–27 (second amended intervenor complaints).) To advance this goal, the Intervenors each filed a series of claims under the Clean Water Act related to different aspects of U.S. Steel's violation, including the unauthorized discharge of pollutants, violations of narrative water quality standards, and failure to adequately maintain equipment.[16] (DE 85 at 29–32, 86 at 22–26; 2:18-CV-20 DE 1 at 31–36; 2:18-CV-33 at 27–33.) The merits of this case concluded with the Intervenors achieving considerable portion of their goals; U.S. Steel paid a civil penalty to the Governments of the United States and Indiana for its past violations and agreed to a Revised Consent Decree which the Court found would address the conditions which led to past violations and would promote future compliance. (*See* DE 105 at 26–32 (order adopting consent decree discussing technical adequacy); DE 46-1 at 32 (consent decree civil penalty provision).)

That said, in the Intervenors' view this is only a partial success as they do not believe the revised consent decree is sufficient to achieve its purpose. (*See* DE 105 at 25–39 (discussing the Intervenors' objections to the revised consent decree).) Nor did they consider the civil penalty imposed to be adequate compensation for the violations. (*Id.* at 22 (noting Surfrider's objection to the amount of the penalty.)) Therefore, it would appear the Intervenors have largely achieved at least one of their two goals in bringing this litigation, as U.S. Steel paid a penalty for its violations and the Intervenors assistance to the Government's litigating position helped bring about that outcome. The Intervenors only marginally achieved their second goal, in that they obtained *something* that will reduce the risk of future violations. Translating this into

---

[16] The City of Chicago also filed a negligence claim which is not pertinent to this fee analysis. (2:18-CV-33 DE 1 at 33.) This negligence claim was not barred by *res judicata* and the City was granted leave to refile this claim in a separate suit; the suit was subsequently resolved by a settlement between the City and U.S. Steel. (*City of Chicago v. U.S. Steel Corp.*, 2:22-CV-357, DE 27.)

percentages, the Court finds the Intervenors were fifty percent successful in achieving their overall goals here. They obtained the result of U.S. Steel admitting violations and paying a penalty for those violations. They also reduced the risk of future spills by helping improve the consent decree, which was ultimately adopted, and the Court found adequate to accomplish its goals.

As noted above, the Intervenors made some contributions to the substance of the consent decree. They advocated for the inclusion of the EBP and provided unique feedback to the Governments on the EBP draft, which impacted the final plan. The Intervenors' advocacy also resulted in changes to the notification requirements contained in Appendix B. That said, the principal work of drafting and preparation was completed by the Governments' counsel. The Revised Consent Decree is over fifty pages of substantive terms, and includes multiple mechanisms or procedures for which it is unclear if the Intervenors contributed to the development. (*See, e.g.,* DE 46-1 at 13–14 (Facility Wastewater O&M Plan), 14–15 (Preventive Maintenance Plan), 16–17 (Wastewater Process Monitoring System), 17–18 (Hexavalent/Total Chromium Monitoring), 33–37 (Stipulated Penalties for violations of Decree).) The Intervenors diligence in reviewing the proposed terms of the Governments and ensuring the adequacy of those terms is value added to the final document, but of a different order of magnitude than if they had been the principal authors or been responsible for substantial rewriting of the document. Put another way, double checking the work of the Governments is a compensable benefit but should be proportional to the actual contribution when the public benefit of the document derives from the quality of the Government drafters' work and not the Intervenors adjustments.

Therefore, the Court will make a downward adjustment of fifty percent to the overall attorney's fee request to reflect the relative success of the Intervenors. This adjustment will be

applied separately from the adjustment to the requested attorney hours. Surfrider's request was for $791,820.75 in attorney's fees. Fifty percent of this amount is $395,910.37. The City of Chicago requested $798,507.40 in attorney's fees. Fifty percent of this amount is $399,253.70.

The final adjustments to the Intervenors' request for fees and costs, pre-interest, is summarized in the chart below.

| Surfrider Fees and Costs | | City of Chicago Fees and Costs | |
|---|---|---|---|
| Attorney's Fees Request | $791,820.75 | Attorney's Fees Request | $798,507.40 |
| Adjustment for Relative Success | ($395,910.38) | Adjustment for Relative Success | ($399,253.70) |
| Adjustment for Reliance on Reconstructed Records | ($79,181.94) | Adjustment for Reliance on Reconstructed Records | ($79,850.09) |
| Net Attorney's Fees | $316,728.43 | Net Attorney's Fees | $319,403.61 |
| Expert Fees and Other Costs Award (Undisputed) | $21,544.50 | Expert Fees and Other Costs Award (Undisputed) | $64,702.50 |
| **Net Fees and Costs** | **$338,272.93** | **Net Fees and Costs** | **$384,106.11** |
| **Total Pre-Interest Intervenor Fees and Costs** | | **$722,379.04** | |

*(c) The recovery of prejudgment interest*

The Intervenors have also requested that their attorney's fee request be enhanced with prejudgment interest to account for the delay between the outlay of their work and the award of fees. U.S. Steel has not addressed this request in their response.

The Seventh Circuit has recognized that there are two methods by which a court can compensate parties for the time elapsed between the outlaw of work and the award of fees. First, the "current rate" method of awarding fees based on the attorney's rates at the time of the award. *Shott v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 338 F.3d 736, 715 (7th Cir. 2013). Second, the "historical rate plus interest" method whereby the court awards fees based on the rates at the time services were rendered and add prejudgment interest on that amount. *Id.* The Seventh Circuit has

held that the second method is likely the most accurate, the most straightforward, and that there is a presumption in favor of awarding prejudgment interest. *Id.* Prejudgment interest is set at the market rate, the average of the prime rate for the relevant years. *Frey v. Coleman*, 903 F.3d 671, 675 (7th Cir. 2018).

The relevant period during which the merits case was pending is between the filing of the first Citizen Suit complaint on January 17, 2018, by Surfrider (2:18-CV-20, DE 1) and the Court's order closing that case on September 22, 2022 (*Id.* at DE 25.) Data from the Federal Reserve indicates there were fourteen different prime rates during that period.[17] The average of these rates is 4.66 percent.

Surfrider requests attorney's fees related to the merits of their claim in the amount of $671,935.54. Fifty percent of this sum, reflecting the Court's adjustment for relative success, is $335,967.77. (DE 123-2 at 204 (Exh. Q).) Multiplying this sum by the average rate, compounded annually for the tenure of four years, results in an interest adjustment of $62,624.39. The City of Chicago requests attorney's fees related to the merits of their claim in the amount of $610,682.50. (DE 123-3 at 183 (Exh. CC).) Fifty percent of this sum, reflecting the Court's adjustment for relative success, is $305,341.25. Multiplying this sum by the average rate, compounded annually for the tenure of four years, results in an interest adjustment of $56,915.61. Below is a summary chart indicating how these adjustments for prejudgment interest affect the overall fee awards.

| Surfrider Fees and Costs | | City of Chicago Fees and Costs | |
|---|---|---|---|
| Pre-interest Fees and Costs | $338,272.93 | Pre-interest Fees and Costs | $384,106.11 |

---

[17] As of 12/14/2017 (in effect on January 17, 2018): 4.5%, 3/22/2018: 4.75%, 6/14/2048: 5%, 9/27/2018: 5.25%, 12/20/2018: 5.5%, 8/1/2019: 5.25%, 9/19/2019: 5%, 10/31/2019: 4.75%, 3/4/2020: 3.5%, 3/16/2020: 3.25%, 3/17/2022: 3.25%, 5/5/2022: 4%. 6/16/2022: 4.75%, 7/28/2022: 5.5%. *Bank Prime Loan Rate Changes: Historical Dates of Changes and Rates*, Federal Reserve Bank of St. Louis, https://perma.cc/WE5X-34PS (last accessed March 12, 2024).

| | | | |
|---|---|---|---|
| Prejudgment Interest Adjustment | $62,624.39 | Prejudgment Interest Adjustment | $56,915.61 |
| **Net Fees and Costs** | **$400,897.32** | **Net Fees and Costs** | **$441,021.72** |
| **Total Post-Interest Fees and Costs** | | **$841,919.04** | |

### (4) U.S. Steel's motion to bifurcate for the purposes of discovery and an evidentiary hearing on the amount of fees is denied

U.S. Steel has, in the alternative, requested that if the Court finds the Intervenors entitled to attorney's fees that the proceedings should be bifurcated between the determination of eligibility for fees and the reasonable amount of fees. (DE 126, DE 127 at 23–24.) U.S. Steel argues bifurcation is necessary because their objections to the amount of Intervenor's requested fees create a "discovery-laden question" which will likely require discovery and an evidentiary hearing to resolve. (DE 127 at 23.) The Court disagrees with that assessment and will consequently deny the bifurcation request.

A court may bifurcate claims "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b) ("Separate Trials"); *Gen. Citrus Int'l Inc. v. Remien*, No. 04 C 6402, 2009 WL 2409580, at *2 (N.D. Ill Aug. 5, 2009) (utilizing the Rule 42 framework to consider whether to bifurcate a request for attorney's fees). The Seventh Circuit has instructed that bifurcation is appropriate only if certain conditions are met. *Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1121 (7th Cir. 1999). First, the court is to determine whether bifurcation would "avoid prejudice to a party or promote judicial economy." *Id.* If so, then the court must be satisfied that "the decision to bifurcate does not unfairly prejudice the non-moving party" or would violate the Seventh Amendment. *Id.* The moving party has the burden to show bifurcation is proper. *Albert's Diamond  Jeweler's, Inc. v. Aaland Diamond Jewelers LLC*, No. 2:23-CV-39, 2023 WL 6284632, at *3–4 (N.D. Ind. Sept. 27, 2023) (internal citation omitted).

This is a question vested in the discretion of the district court, but bifurcations is "the exception, not the rule." *Id.* (discussing separate trials).

As it relates to fees specifically, the Supreme Court has cautioned lower courts against treating a fee petition as a "second major litigation." *Hensley*, 461 U.S. at 437. As a matter of course, district courts resolve the question of entitlement to fees and the reasonableness of fees simultaneously. *See e.g.*, *Gen. Citrus*, 2009 WL 2409580, at *2. This includes in complex environmental cases. *See, e.g., Greenfield Mills, Inc. v. Carter*, 569 F. Supp. 2d 737 (N.D. Ind. 2008); *Agriprocessors*, 489 F. Supp. 2d 881. However, it is not unheard of for district courts to utilize discovery and evidentiary hearings in resolving fee requests when the situation requires these tools. *See e.g.*, *Baird v. Indianapolis*, 830 F. Supp. 1183, 1189 (S.D. Ind. 1993). The decision on whether or not to reopen discovery is vested within the discretion of the trial court. *Winters v. Fru-Con Inc.*, 498 F.3d 734, 743 (7th Cir. 2007). Likewise, the decision to grant or deny an evidentiary hearing is within the discretion of the district court. N.D. Ind. L.R. 7-5.

In determining whether bifurcation is proper, the Court will first address whether it would promote judicial economy. The answer is no. Bifurcating the fees proceeding would further drag out this case and is unnecessary to resolve the fees motion. Bifurcation would only be economical in this case if the additional discovery and evidentiary hearing, would assist the Court in determining the reasonableness of the fee award.

The Court finds that the request for discovery and an evidentiary hearing is not well taken as it would not help the Court determine the reasonableness of the fee. U.S. Steel's request for discovery is ancillary to their dispute about the accuracy of the Intervenor's reconstructed attorney time logs, but U.S. Steel does not identify specific factual disputes whose resolution would be aided by discovery or an evidentiary hearing. As discussed previously, U.S. Steel's

dispute about the accuracy of the attorney time records is fairly generic and relates to the overall methodology of the Intervenor's record keeping and potential inaccuracies or duplicative effort.

Also as previously noted, these concerns have some merit which resulted in the Court making an across-the-board adjustment to the fees' request to reflect the risk of error in reconstruction. That said, U.S. Steel's general suppositions that some work reflected in the time logs could be duplicative is not a sufficient reason to prolong these proceedings with discovery and an evidentiary hearing. As illustrated in the Court's prior discussion, the arguments related to potential duplicative time are rather generic as well.

U.S. Steel has not identified any particular examples of logged time it is concerned about or provided a specific basis to question any individual unit of recorded time.[18] U.S. Steel needs something more than its naked suspicion of opposing counsel to merit further discovery in this case. The Intervenors have provided a very thorough explanation of the methodology employed in assembling their time logs and included a considerable number of supporting documents. The Intervenors are obligated to show the reasonableness of their requested fees, but that does not mean they are required to prove their entitlement to fees beyond a reasonable doubt. *Hensley*, 461 U.S. at 433.

Given the generality of U.S. Steel's request the Court is not persuaded that discovery, or an evidentiary hearing, would be productive as it is unclear what questions would be resolved and thus what benefit would be realized by extending these proceedings. Further, the Court finds

---

[18] To put a finer point on it, U.S. Steel has not offered any examples of a particular time log it suspects of being inaccurate or unreasonable but seems to want to pursue a relatively open-ended inquiry into Intervenors' counsel about interactions they have had over the course of six years in conducting this litigation. It would be one thing if U.S. Steel could point to a certain entry which facially seems wildly disproportionate to the task at hand (e.g. spending 20 hours on drafting a joint motion to continue a deadline) or concerningly dissimilar from the time it took U.S. Steel's own counsel to complete a similar task (e.g., if the Intervenors counsel took four or five times as many hours to complete briefing on a motion than it took U.S. Steel's counsel based on U.S. Steel's contemporary records). But as it stands the Court knows of no specific issue or discrepancy which further discovery might resolve.

its decision to reduce the Intervenor's requested hours by ten percent given their manner of record keeping mitigates any risk of prejudice because of the denial of the request for discovery. All in all, further discovery is not clearly necessary to resolve this motion. As such, further discovery does not serve the interest of judicial economy and consequently bifurcation also does not serve the interest of judicial economy.

Next the Court will consider the question of prejudice resulting from bifurcation. The Intervenors claim that bifurcation would prejudice them while U.S. Steel claims a denial of bifurcation would prejudice them.

The Intervenors' claim bifurcation would prejudice them by forcing them to relitigate issues they addressed in preparing their request for fees and give U.S. Steel a second bite at the apple on the question of fees. Specifically, the Intervenors note the thorough nature of their fee petition and argue the work of preparing it would have to be repeated if the Court allowed a bifurcated proceeding. That involves a new round of briefing. The Intervenors also argue the issue of fee amount should be settled in the same briefing as fee eligibility and that if U.S. Steel wanted more time to review the fee request, they should have asked for it instead of seeking a delay through bifurcation. They point to the fact there was already an extension of U.S. Steel's response deadline by agreement of the parties, which indicates they would have agreed to further extension at U.S. Steel's request. The Intervenors also argue they would be prejudiced because the litigation would cause unreasonable delay in a six-year-old case which is nearing resolution.

The Court partially agrees with the Intervenors and finds they would be prejudiced. The Court partially disagrees with the Intervenors' first point regarding additional briefing and a second bite at the apple for U.S. Steel. The Court does not agree with Intervenor's argument related to relitigating certain points. Another round of briefing is certainly an unwelcome task,

but the Intervenors would not have to make a new petition from whole cloth if proceedings were bifurcated. Their existing work would provide a baseline for responding to specific and targeted disputes raised by U.S. Steel.

That said, the Court agrees with the Intervenors that U.S. Steel is not entitled to a gratuitous second chance to dispute the amount of fees. As discussed previously, U.S. Steel has not made the most of their initial opportunity to identify specific issues with the Intervenors' request which would merit the additional discovery they seek. Bifurcating the proceeding would give U.S. Steel another opportunity to develop the arguments they should have made in the first instance. As the Intervenors note, U.S. Steel was already granted one extension to file their response and could have requested another to adequately develop arguments which would suggest the need for further discovery. Instead, U.S. Steel chose to base that request on generic arguments about potential issues in the Intervenors' request. Giving U.S. Steel this second chance, without any reasonable basis, would no doubt cause considerable prejudice to the Intervenors.

As to their last point, the Court is sympathetic and agrees with the parties in their desire to bring an expeditious end to these long running proceedings. In any other case, the prejudice of further extension would weigh strongly in the Intervenors favor. In this case, however, countervailing considerations reduce the strength to modest or marginal. This was a substantively complicated case which also developed into an unusual and complicated procedural posture which merits caution and diligence. Further, the Intervenors are requesting a considerable sum in fees and U.S. Steel is entitled to exercise due diligence in evaluating that request. These circumstances mean that while further delay does still cause some prejudice to the Intervenors, it is only modest.

U.S. Steel's argument is that the denial of discovery and an evidentiary hearing would prejudice them by denying them the ability to test the reasonableness of the Intervenor's time entries, as well as the methodology for reconstructing them.[19] (DE 130 at 9–10.) As discussed above, the Court is not persuaded by U.S. Steel's request given the generality of their arguments. Without rehashing the Court's prior analysis, if U.S. Steel had presented a specific inquiry to pursue, or an inconsistency or irregularity in the fee petition documents which could conceivably be resolved by further discovery, the Court would consider their request. As it stands, there are only vague allegations of potential issues which might be explored, and it is unclear how more discovery would resolve them. The Court accordingly finds that a denial of further discovery and an evidentiary hearing would not prejudice U.S. Steel.

As such, the Court finds that bifurcating the fees petition to allow for further discovery would not serve the interest of judicial economy and would prejudice the Intervenors, while denying bifurcation would not prejudice U.S. Steel. Thus, the motion to bifurcate will be denied.

### C. Conclusion

Accordingly, the Court GRANTS the motion for attorney's fees and costs as modified by this order. (DE 123.) The motion to bifurcate is DENIED. (DE 126.) The Court AWARDS attorney's fees and costs under 33 U.S.C. § 1365(d) in the gross amount of $400,897.32 to counsel for the Surfrider Foundation and in the gross amount of $441,021.72 to counsel for the City of Chicago.

---

[19] U.S. Steel also makes an editorial comment about the "irregular supporting materials" behind the Intervenors request. (DE 130 at 8.) The Court presumes this a reference to U.S. Steel's prior argument about the reliability of Attorney Templeton's declaration which the Court has previously addressed. The Court discerns no other "irregularity" in the supporting documents submitted by the Intervenors. Declarations by relevant individuals, summary charts, CVs, and records are hardly unusual documents in a fee petition.

SO ORDERED.

ENTERED: March 19, 2024

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court